NOS. 07-08-0142-CR, 07-08-0143-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

AUGUST 31, 2009
_____

CARLOS JOSE CORDOVA, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE
_____

FROM THE 223RD DISTRICT COURT OF GRAY COUNTY;

NOS. 7397, 7398; HONORABLE LEE WATERS, JUDGE
_____

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

**OPINION**

In October 2006, appellant Carlos Jose Cordova was charged in two separate indictments with aggravated robbery with a deadly weapon.[1] The two charges were tried together and the jury convicted appellant as charged. Presenting four issues, appellant

---

[1] Appellant was charged with "on or about the 21st day of May, 2006...while in the course of committing theft of property and with intent to obtain or maintain control of said property, intentionally or knowingly threaten[ing] or plac[ing] Layne [and Mae] Conner in fear of imminent bodily injury or death, and ...then and there us[ing] or exhibit[ing] a deadly weapon, to wit: a firearm...". Appellant was originally charged with two counts of aggravated assault in addition to the offenses for which he was tried. Following appellant's convictions for aggravated robbery, the State agreed to dismiss the aggravated assault charges.

now appeals from his convictions[2] and the resulting concurrent sentences of forty-five years' imprisonment. We will affirm the trial court's judgments.

## Background

Layne Conner testified he does not like banks, so he kept cash in the home in Pampa, Texas, he shared with his wife Mae and their nine-year-old grandson. In May 2006, he had over $30,000 in cash and $5000 in checks divided among three bank bags he kept in a locked filing cabinet in a back room of the house. Mr. and Mrs. Conner and their grandson were visiting family in another part of the state for several days when Mr. Conner considered buying a vehicle. He testified he wanted to make sure he had enough cash for the purchase, so on Wednesday May 17, he called their adult daughter Mayla Arreola, who also lived in Pampa. He told his daughter about the cash, and asked her to open the cabinet and count the cash. Mayla testified she counted between $32,000 and $34,000, and called her father with the count. He told her not to tell anyone about the money. Mayla, however, told her husband and told her friend Tiffeni Martinez. Tiffeni Martinez was close to the Conners, and had been in their home many times. Mae Conner described her as a "second daughter."

The Conners returned to their home Saturday evening, May 20. The next morning, two masked gunmen kicked in the back door of the home. One forced Mrs. Conner to get on the floor and held her at gunpoint with a shotgun. The other first told Mr. Conner to get on the floor, then went directly to the back room. Mr. Conner testified he heard the

---

[2] *See* Tex. Penal Code Ann. § 29.03 (Vernon 2003).

2

gunman open a filing cabinet drawer, and try to open the locked cabinet. The gunman returned to Mr. Conner and told him to open the cabinet. As Mr. Conner went to a bedroom to get the key, the gunman followed. Telling Mr. Conner to hurry, the man fired his pistol toward a bed and threatened to shoot Mr. Conner in the heart. Mr. Conner later discovered his grandson was hiding under that bed.

When the gunman told Mr. Conner he wanted the money, Mr. Conner responded, "What money?" The gunman replied, "You know what money I'm talking about." With his back to the gunman, Mr. Conner opened the cabinet and gave the gunman two of the three bank bags, containing a total of some $4900. Both gunmen left the house, again threatening to kill Mr. Conner. They also took Mrs. Conner's purse, which contained $800 in cash. Mr. Conner followed the robbers outside in time to hear car doors slam, and see a "newer Jeep" drive away.

Mae Conner testified as follows concerning her immediate reaction to the robbery:

Q:    What did you do then [after her husband told her the robbers were gone]?

A:    Well, [Mr. Conner] had taken out the back door to see if he could see anything. I picked up the phone. I was–I was–You know, I was shaking and I picked up the phone and I called Mayla first, and I said "Who did you tell about the money?" I said "We were just robbed at gunpoint." She said "Nobody." I said "I've got to go." And then I called 9-1-1.

Q:    Why did you call Mayla first?

A:    I don't really know. I just knew that other than us, she was the only one that knew, so I called her first to see. I really don't know why I called her first. I

3

wasn't on the phone with her just that long, long enough to say that, and I said "I've got to go." And I got up and called 9-1-1.

Tiffeni Martinez is married to Andrew Martinez. They also lived in Pampa. Andrew Martinez and appellant are cousins. Appellant then lived in Amarillo.

A CrimeStoppers tip from Amarillo eventually led police to Priscilla Badillo. Badillo testified at trial concerning a conversation she heard in Amarillo on the Friday before the Sunday robbery. The conversation was between Davey Enriquez[3] and another man.[4] She said the conversation involved "[s]omething about [appellant's] cousin that . . . lived here in Pampa had told him about some money, something about a kid and a gun, and that's about it." When she heard a news report Sunday evening about the robbery in Pampa, she recalled the conversation she had overheard on Friday.

Another witness, Danielle Holmes, testified she lived in Amarillo and that appellant, Enriquez and a third person came to her home on Saturday evening, May 20, while Holmes's neighbor Woody was there. Enriquez stayed in the car but appellant came inside her home and talked with Woody. Appellant told Woody they were going to Pampa, and asked if Woody was going. According to the conversation, appellant "was supposed to keep control of the little boy and that there was a lot of money involved." Appellant also told

---

[3] *See Enriquez v. State,* Nos. 07-08-0060-CR, 07-08-0061-CR, 07-08-0062-CR, 07-08-0063-CR, 2009 WL 1977898 (Tex.App.–Amarillo July 7, 2009, no pet. h.) (not yet released for publication).

[4] There is no suggestion the other man was appellant.

Woody that appellant's cousin had called to say that "It's set up . . . ." Holmes talked Woody out of going to Pampa with the others, testifying she "had a real bad feeling."

Holmes testified appellant returned to her home hours later, before daybreak Sunday morning, again to speak to Woody. She again overhead part of their conversation. Woody asked appellant, "Well, what happened?" Appellant responded, "It didn't go as planned." Some time later, after Holmes had moved to another house, appellant and Enriquez came to her house, "wanting to know who told on them." The men told her they had been "pulled over and questioned." When Holmes heard news reports of the Conners' robbery, she also concluded the reports were describing the same events she heard appellant discuss at her home. She contacted CrimeStoppers.

After Mayla Arreola admitted she had told her friend Tiffeni Martinez about her parents' hidden cash, the Pampa police detective working on the case visited with Andrew and Tiffeni Martinez. During that visit, the detective learned that Andrew had a cousin in Amarillo, appellant. The detective testified that Andrew said he had not spoken with his cousin in "a year, year and a half." Subpoenaed telephone records, however, showed many calls between the Martinez's phone and appellant's in the days surrounding the robbery, including six calls on May 19 and three on May 20, as well as several calls in days following.

The Conners did not identify the robbers. Mr. Conner testified the man who went to the back room had a "Spanish" accent and was "a lot smaller" than the larger man

5

holding a shotgun on his wife. Mrs. Conner testified that both men were "Hispanics" and the one holding the shotgun on her was stockier than the other.

Analysis

*Limitation of Appellant's Voir Dire Examination*

We begin with appellant's second issue, by which he argues the trial court abused its discretion by imposing limitations on his voir dire examination of the venire on the subjects of reasonable doubt and the State's burden of proof.

During voir dire, the State voiced several objections concerning appellant's questioning of the panel regarding the State's burden of proof, some of which the court sustained. Eventually, after the district attorney and defense counsel sparred over whether the defense was mischaracterizing the State's voir dire, the court questioned the panel on the presumption of innocence and the burden of proof. The court then announced, "All right. At this time I believe the jury is sufficiently qualified regarding the burden of proof. We'll need to move on to voir dire regarding the law applicable [to] other aspects of the law that may be applicable to this case and voir dire questions regarding issues that may be applicable to this case." The court then advised defense counsel he had an additional thirty minutes to voir dire. Without voicing an objection, defense counsel continued his voir dire. On completion of voir dire, the panel was excused, and both sides informed the court of their challenges.[5] Defense counsel then stated,

---

[5] The record also indicates appellant was awarded one additional peremptory challenge, albeit for a reason not related to the issues before us now.

6

I'd move that this venire panel be vacated and a new one brought in because the Court shut down my voir dire and I was not able to ask the questions that I needed to ask in order to explore and examine these venire members' subjective perceptions about certain things and specifically the issue of beyond a reasonable doubt. For that reason and with the Court's treatment of Defense Counsel in front of the venire panel, I believe it's tainted this jury's perception of Defense Counsel which will affect Mr. Cordova's right to have a fair trial.

The court denied appellant's motion. On appeal, appellant contends the trial court abused its discretion by not allowing him to finish his voir dire regarding reasonable doubt and the burden of proof. The State argues that appellant did not preserve this issue for our review. We agree.

Courts have described the purposes of voir dire as (1) to develop rapport between the officers of the court and the jurors; (2) to expose juror bias or interest warranting a challenge for cause; and (3) to elicit information necessary to intelligently use peremptory challenges. *Dhillon v. State,* 138 S.W.3d 583, 587-88 (Tex.App.–Houston [14th Dist.] 2004, pet. stricken); *S.D.G. v. State*, 936 S.W.2d 371, 380 (Tex.App.–Houston [14th Dist.] 1996, pet. denied). A trial court may impose reasonable restrictions on the exercise of voir dire examination, including reasonable limits on the amount of time each party can question the jury panel. *Caldwell v. State,* 818 S.W.2d 790, 793 (Tex.Crim.App.1991), *overruled on other grounds by Castillo v. State,* 913 S.W.2d 529 (Tex.Crim.App.1995); *Ratliff v. State,* 690 S.W.2d 597, 597 (Tex.Crim.App.1985). We review complaints about restrictions on voir dire for abuse of discretion. *S.D.G.*, 936 S.W.2d at 380, *citing McCarter v. State*, 837 S.W.2d 117, 119 (Tex.Crim.App.1992).

When a party complains of an inability to collectively question the venire, a two-part test applies: (1) whether the complaining party attempted to prolong the voir dire; and (2) whether the questions the party was not permitted to ask were proper voir dire questions. *See McCarter,* 837 S.W.2d at 120; *S.D.G.,* 936 S.W.2d at 380. To preserve error concerning the manner of voir dire, appellant must point to a question the trial court did not allow the panel to answer. *S.D.G.*, 936 S.W.2d at 380, *citing Caldwell*, 818 S.W.2d at 794. In *Wooldridge v. State*, for example, a case on which appellant principally relies, counsel was not permitted to ask a venire member what "beyond a reasonable doubt means to you?" *Wooldridge v. State,* 827 S.W.2d 900, 901 (Tex.Crim.App. 1992). Appellant's identification in his motion of the subject "the issue of beyond a reasonable doubt" did not advise the trial court, or a reviewing court, of the specific questions he desired to ask the panel. That is especially true in this instance because appellant had engaged in questioning the panel on that subject. Accordingly, we find his second appellate issue does not present anything for our review, and it is overruled.

*Legal and Factual Sufficiency of Evidence*

We next address appellant's last issue in which he challenges the legal and factual sufficiency of the evidence to support his conviction for aggravated robbery. There is no dispute the Conners were robbed; the issue is the sufficiency of the evidence supporting the State's theory that appellant was one of the robbers.

In reviewing issues of legal sufficiency, an appellate court views the evidence in the light most favorable to the verdict to determine whether, based on that evidence and reasonable inference therefrom, a rational jury could have found each element of the offense beyond a reasonable doubt. *Swearingen v. State*, 101 S.W.3d 89, 95 (Tex.Crim.App. 2003); *Conner v. State*, 67 S.W.3d 192, 197 (Tex.Crim.App. 2001), *citing Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The standard for legal sufficiency review "gives full play" to the jury's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson,* 443 U.S. at 319; *Sanders v. State,* 119 S.W.3d 818, 820 (Tex.Crim.App. 2003). If, given all of the evidence, a rational jury would necessarily entertain a reasonable doubt of the defendant's guilt, due process requires that we reverse and order a judgment of acquittal. *Swearingen*, 101 S.W.3d at 95, *citing Narvaiz v. State,* 840 S.W.2d 415, 423 (Tex.Crim.App. 1992), *cert. denied*, 507 U.S. 975, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993). Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to do so. *Hooper*, 214 S.W.3d at 9, *citing Guevara v. State*, 152 S.W.3d 45, 49 (Tex.Crim.App. 2004). While each fact need not point directly and independently to the guilt of the accused, the cumulative force of circumstantial evidence alone may be sufficient to support a conviction. *Guevara,* 152 S.W.3d at 49. Finally, all evidence, whether properly or improperly admitted, will be considered when reviewing the evidence for legal sufficiency. *Johnson v. State*, 967 S.W.2d 410, 411 (Tex.Crim.App. 1998). *See also Wilson v. State*, 7 S.W.3d 136, 141 (Tex.Crim.App. 1999).

9

A factual sufficiency review considers whether the evidence supporting guilt, though legally sufficient, is so weak that the jury's verdict seems clearly wrong and manifestly unjust, or evidence contrary to the verdict is such that the jury's verdict is against the great weight and preponderance of the evidence. *Grotti v. State,* 273 S.W.3d 273, 283 (Tex.Crim.App. 2008); *Marshall v. State*, 210 S.W.3d 618, 625 (Tex.Crim.App. 2006)*; Watson v. State*, 204 S.W.3d 404, 414-15 (Tex.Crim.App. 2006). Ultimately in a factual sufficiency review, the appellate court must answer the single question whether, considering all the evidence in a neutral light, the jury was rationally justified in finding guilt beyond a reasonable doubt. *Grotti,* 273 S.W.3d at 283, *citing Watson*, 204 S.W.3d at 415. Although an appellate court's authority to review factual sufficiency permits the court to disagree with the fact finder's determinations, even to a limited degree those concerning the weight and credibility of the evidence, the appellate court must accord them due deference. *Marshall*, 210 S.W.3d at 625; *Johnson v. State*, 23 S.W.3d 1, 9 (Tex.Crim.App. 2000). *See also Steadman v. State,* 280 S.W.3d 242, 246-47 (Tex.Crim.App. 2009). When there is a conflict in the evidence, to find it factually insufficient we must first be able to say, with some objective basis in the record, that the great weight and preponderance of all the evidence contradicts the jury's verdict. *Watson*, 204 S.W.3d at 417. We must also discuss the evidence that, according to the appellant, most undermines the jury's verdict. *Laster v. State,* 275 S.W.3d 512, 518 (Tex.Crim.App. 2009); *Sims v. State,* 99 S.W.3d 600, 603 (Tex.Crim.App. 2003).

A person commits the offense of robbery if, in the course of committing theft and with intent to obtain or maintain control of the property, he intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. Tex. Penal Code Ann. § 29.02(a)(2) (Vernon 2003). A person commits the offense of aggravated robbery if he commits robbery and uses or exhibits a deadly weapon. Tex. Penal Code Ann. § 29.03(a)(2) (Vernon 2003). "In the course of committing theft" means conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft. Tex. Penal Code Ann. § 29.01(1) (Vernon 2003).

Considering all the evidence here, we first find the jury rationally could have drawn the same conclusion Mrs. Conner immediately drew, that is, the robbery was connected with Mayla Arreola's knowledge of the presence, amount, and location of the money in her parent's home. The jury heard both the Conners' testimony indicating they had told no one else about the money, yet the Conners had barely returned from their trip before robbers arrived with the clear knowledge of the precise location of the cash.

Second, we find the jury rationally could have drawn the same inferences Badillo and Holmes drew, that is, what the two witnesses overheard being discussed on Friday and Saturday were plans to rob the Conners on Sunday. Particularly in light of the conversation's timing just hours before the robbery, the jury reasonably could have decided the similarity between the robbery in Pampa and the details Holmes heard mentioned in Amarillo was more than coincidental. From the conversation, the jury also reasonably could have believed that appellant not only knew of the robbery plan, but intended to participate. Appellant's statement hours later that, "It didn't go as planned," is a further indication he had

11

participated in the robbery. Enriquez's conversation Badillo overheard on Friday did not contain so many similar details, but did contain a statement important to this case, that appellant's cousin in Pampa was the source of the information about the money Enriquez was discussing.

Holmes testified appellant was driving his Jeep vehicle when he came to her home Saturday evening. She identified the Jeep from a photograph shown her at trial. The photograph was of a Jeep registered to appellant, located by police at the home of appellant's brother in Amarillo. When shown the same photograph, Mr. Conner testified it fit the description he provided police of the Jeep he saw leaving his home after the robbery.

Appellant's general physical characteristics reflected in the record are consistent with the descriptions provided by the Conners. Information taken when appellant was booked into jail described him as "five foot seven" and "one hundred twenty-five pounds."[6]

Appellant's contacts with his cousin Andrew Martinez and his wife Tiffeni on the critical dates, coupled with Andrew's later denial of any contact over a long period of time, the close similarity between appellant's Jeep vehicle and that the robbers drove, and appellant's later complaint to Holmes that someone "told" further support the reasonableness of the jury's finding of guilt.[7] The State can prove identity through direct

---

[6] Davey Enriquez, by contrast, was described as "five foot six" and "[t]wo hundred ten pounds."

[7] The State also introduced audio recordings of some of the telephone conversations appellant conducted while in jail. The jury could have taken appellant's statements in those

evidence and inferences, as well as through circumstantial evidence. *Earls v. State,* 707 S.W.2d 82, 85 (Tex.Crim.App. 1986); *Roberson v. State,* 16 S.W.3d 156, 157 (Tex.App.–Austin 2000, pet. ref'd). *See also Sosa v. State,* 177 S.W.3d 227, 230 (Tex.App.–Houston [1st Dist.] 2005, no pet.) (identification based on an individual's build and other characteristics, when corroborated with additional evidence, can be legally sufficient); *Hutchison v. State,* 42 S.W.3d 336, 342-43 (Tex.App.–Texarkana 2001), *aff'd,* 86 S.W.3d 636 (Tex.Crim.App. 2002) (recognizing same). Further, there is no legal requirement that property stolen must be recovered in whole or in part to constitute the offense of robbery. *Russo v. State,* 228 S.W.3d 779, 794 (Tex.App.–Austin 2007, pet. ref'd), *citing Chaney v. State,* 474 S.W.2d 711, 712 (Tex.Crim.App. 1972); *Dean v. State,* 154 S.W.2d 459 (Tex.Crim.App. 1941).

Viewed in the light most favorable to the verdict, we find the combined force of the incriminating circumstances allowed the jury rationally to conclude, beyond a reasonable doubt, that appellant was one of the robbers. *Hooper,* 214 S.W.3d at 9. The evidence supporting guilt is legally sufficient.

Evidence contrary to the verdict includes appellant's wife's testimony that he was at home watching their children while she was ill in bed at the time of the robbery. Appellant also emphasizes the Conners were unable to identify him as one of the robbers. He notes

conversations as innocent, but the jury also could have considered them to be consistent with appellant's guilt.

13

also that witnesses gave varied descriptions of the Jeep seen the day of the robbery,[8] and that no firearm or ballistics evidence was linked to him, no DNA evidence or fingerprints were found and none of the stolen cash was recovered. At trial, appellant attacked the credibility of the State's witnesses.[9] The trier of fact is the sole judge of the credibility of witnesses and may believe or disbelieve any part of a witness's testimony. *Gaines v. State,* 874 S.W.2d 733, 734 (Tex.App.–Houston [1st Dist.] 1994, no pet.). Further, the trier of fact may believe a witness even though his testimony is contradicted. *Sharp v. State,* 707 S.W.2d 611, 614 (Tex.Crim.App. 1986); *Gaines,* 874 S.W.2d at 735. We must give due deference to the fact-finder's determinations, particularly those determinations concerning the weight and credibility to be given items of evidence. *Johnson,* 23 S.W.3d at 9. The jury was free to disbelieve appellant's wife's testimony, and we cannot agree with appellant that the inconsistencies to which he refers render the evidence presented insufficient.

Viewing the entire record in a neutral light, we do not find the evidence favoring guilt is so weak that the jury's verdict seems clearly wrong and manifestly unjust or that, giving due

---

[8] Mr. Conner testified the Jeep he saw leaving his home was light gray over dark gray. Mr. Conner also described the Jeep as gray with dark gray on the bottom and in his written statement, he said the Jeep was gray over black.

[9] Holmes's testimony contains another possible inconsistency. She said appellant's second visit to her home at the time of the robbery, during which appellant told Woody, "It didn't go as planned," occurred early Sunday morning, "before daybreak." If she was correct, appellant's statement could not have referred to the robbery itself because the robbery occurred just before 9:00 Sunday morning. Holmes was not further questioned about her "before daybreak" remark. It is possible appellant's statement to Woody referred not to the robbery itself but to some aspect of preparation for the robbery. In any event, we do not find the time discrepancy inherent in Holmes's statement so serious as to undermine confidence in the verdict.

consideration to the evidence contrary to the verdict, the great weight and preponderance of all the evidence contradicts the jury's verdict. The evidence is factually sufficient.

We overrule appellant's fourth issue.

*Denial of Motions for Mistrial*

Appellant's first issue involves statements contained in two of his jailhouse telephone conversations, which were recorded and admitted into evidence for the limited purpose of showing contact between appellant and Tiffeni Martinez or her husband Andrew. In one statement the jury heard, in a conversation with Tiffeni Martinez appellant made reference to his previous experience with a court-appointed attorney. The second statement, also made during a conversation with Tiffeni Martinez, was a comment to the effect that Davey Enriquez's record was worse than appellant's and that Enriquez's bail would likely be a lot higher. Appellant timely objected to admission of both statements as evidence of extraneous offenses.[10] The trial court sustained both objections, and instructed the jury to disregard the statements, but denied appellant's motion for a mistrial. On appeal, appellant contends the trial court abused its discretion by denying a mistrial after the jury heard the second statement.[11]

---

[10] *See* Tex. R. Evid. 404(b).

[11] After the jury heard the reference to appellant's prior experience with a court-appointed attorney, the trial court admonished, "I would caution the State's attorney to carefully consider each section of this audio portion. We don't need to get into any other matters that are not admissible. I don't want to waste all our time here . . . ." At trial and again on appeal, appellant has contended the District Attorney deliberately violated the court's earlier grant of a motion *in limine* by including the objectionable statements in the audios played for the jury, particularly after the trial court's admonishment. The remedy

15

The denial of a motion for mistrial is reviewed under the standard of abuse of discretion. *Webb v. State*, 232 S.W.3d 109, 112 (Tex.Crim.App. 2007); *Lusk v. State*, 82 S.W.3d 57, 60 (Tex.App.–Amarillo 2002, pet. ref'd), *citing Trevino v. State,* 991 S.W.2d 849, 851 (Tex.Crim.App. 1999). A trial court does not abuse its discretion when its decision is within the zone of reasonable disagreement. *Wead v. State*, 129 S.W.3d 126, 129 (Tex.Crim.App. 2004); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App. 1991) (op. on reh'g). It is presumed the jury will obey an instruction to disregard. *Nichols v. State*, 754 S.W.2d 185, 200 (Tex.Crim.App. 1988). Testimony referring to extraneous offenses thus can be rendered harmless by an instruction to disregard it, unless it is so clearly calculated to inflame the minds of the jury and is of such a nature as to suggest the impossibility of withdrawing the impression produced. *Lusk*, 82 S.W.3d at 60, *citing Kemp v. State*, 846 S.W.2d 289, 308 (Tex.Crim.App. 1992). Accordingly, a mistrial is appropriate only when the event is "so emotionally inflammatory that curative instructions are not likely to prevent the jury from being unfairly prejudiced against the defendant." *Id.* at 60.

We find no abuse of discretion in the trial court's denial of a mistrial. There is nothing especially inflammatory about the references the jury heard to appellant's prior experience

---

for a violation of a ruling on a motion *in limine* rests with the trial court. *Lusk v. State*, 82 S.W.3d 57, 60 (Tex.App.–Amarillo 2002, pet. ref'd). The record reflects the court reporter was not asked to transcribe the contents of the audio recordings into the record. We have reviewed the audio recordings. They are of poor quality. Even after the second objectionable statement was played twice with the jury absent, there was disagreement between the State and appellant's counsel over the exact wording reflected by the recording. The District Attorney assured the trial court the inclusion of appellant's references to extraneous involvement with the criminal justice system was unintentional, and we see no abuse of discretion in the court's apparent acceptance of that explanation.

16

with a court-appointed attorney and appellant's "record." The statements of which appellant complains are of the nature courts have found curable by instructions to disregard. In *Tennard v. State*, 802 S.W.2d 678, 685 (Tex.Crim.App. 1990), the court found a prompt limiting instruction given after a witness referred to the defendant's prior prison time cured any error. The same conclusion was reached in *Barney v. State*, 698 S.W.2d 114, 125 (Tex.Crim.App. 1985), in which the court determined that an instruction to disregard a reference to appellant's status as an "ex-con" sufficiently cured any error. The court noted that an accused may not be tried for some collateral crime or for being a criminal; however, not every improper response requires reversal and, except in extreme cases, if a timely objection to the remark is sustained, and the trial court instructs the jury to disregard, the error is cured. *Id.* Likewise, in *Evans v. State*, 643 S.W.2d 157, 161 (Tex.App.–Austin 1982, no writ), the court found error was cured by an instruction to disregard when an officer testified that the victim was shown a second photographic lineup because the defendant had been implicated as a member of a robbery team. *See also Kemp,* 846 S.W.2d at 308.

Appellant contends the court's instructions to disregard were ineffective because too much time elapsed between the jury's reception of the objectionable statements and the court's instructions. We disagree. In both instances, the record reflects the evidence was heard by the jury, the court considered objections, heard argument, ruled on the objections and then gave instructions to the jury. Although the jury was removed from the courtroom on the second instance and the amount of time that elapsed is not clear from the record, the court gave the instruction to disregard immediately on the jury's return to the courtroom after

17

a recess.[12]  The instructions were given as promptly as possible under the circumstances, and we find their presumed curative effect here was not allayed.  *Cf. Fuller v. State,* 827 S.W.2d 919, 926 (Tex.Crim.App. 1992) (instruction given morning after objectionable reference to collateral offense too late to cure error by itself).

We overrule appellant's first issue.

*Denial of Due Process by Refusing to Exclude Evidence*

At appellant's behest, before Danielle Holmes testified she was subjected to voir dire examination outside the jury's presence, concerning the circumstances under which she overheard the first conversation between appellant and Woody on May 20.  She told the court part of the conversation she overheard took place inside her home.  She said appellant and Woody left the house at a point, however, and the rest of their conversation took place at the curb alongside appellant's vehicle.  Holmes testified she had a security camera mounted outside her home at the time, and it had the capability to transmit sound, as well as video images.  The camera was wired into her television.  Holmes said when appellant and Woody went outside during their conversation, she turned up the volume control on her television because she wanted to hear what they were saying.  By this means, she said, she heard appellant make some of the incriminating statements to which she later testified.

---

[12] After argument with the jury absent, the court announced a recess for "ten or fifteen minutes" to consider its ruling on the motion for mistrial.

18

Shortly before trial, appellant caused a subpoena duces tecum to be issued to Holmes, requiring her to appear at trial, and to bring with her the audio and video equipment. Holmes did not bring the equipment to trial, and told the court her security system did not record its video or audio transmissions and the camera hardware had been stolen. Appellant objected that allowing her to testify about the curbside conversation without allowing him the opportunity to test the equipment by which she claimed to have heard the conversation deprived him of a fair trial. The court overruled appellant's objections, and allowed Holmes to testify to the extent it did not require expert or specialized knowledge.

By his third issue, appellant reiterates his contention he was denied due process of law by the trial court's refusal to exclude Holmes's testimony to the contents of the curbside conversation. In considering a trial court's ruling on the admissibility of evidence, we determine whether the trial court abused its discretion. *Montgomery,* 810 S.W.2d at 372. A trial court abuses its discretion when it acts without reference to any guiding rules and principles. *Id.* Further, an appellate court must uphold the trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *State v. Ross,* 32 S.W.3d 854, 856 (Tex.Crim.App. 2000).

Appellant cites article 24.02 of the Code of Criminal Procedure, which provides that if a witness possesses any instrument or writing or other thing desired as evidence, a subpoena may specify that evidence and direct the witness to produce it in court. Tex. Code Crim. Proc. Ann. art. 24.02 (Vernon 1989). We held in *Martin v. Darnell,* 960 S.W.2d 838, 841 (Tex.App.–Amarillo 1997, no pet.) that a defendant's right under the statute to secure

19

evidence material to his defense arises out of the Sixth Amendment right to compulsory process.[13]  As was the case in *Martin*, 960 S.W.2d at 842, the record here compels the conclusion appellant was not denied any right given him by article 24.02.  By its terms, article 24.02 applies to things in the possession of a witness.  Holmes told the court the equipment appellant sought had been stolen.

We next consider whether due process required the trial court to exclude Holmes's testimony despite the inapplicability of article 24.02.  *See Martin*, 960 S.W.2d at 842 (examining whether constitutional right required that defendant have greater access to documents sought than that provided by statute).  Appellant treats the issue as involving a restriction of the right to compulsory process, citing *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) and *Coleman v. State*, 966 S.W.2d 525 (Tex.Crim.App. 1998).  Appellant's contention also bears similarity to those discussed in *Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987), *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982) (referring to case law "in what might loosely be called the area of constitutionally guaranteed access to evidence") and *Thomas v. State*, 837 S.W.2d 106 (Tex.Crim.App. 1992), all involving defendants who were deprived in some manner of access to or use of evidence.  In some instances, the deprivation is treated as a violation of the right of confrontation. *See, e.g., Ritchie*, 480 U.S. at 51, 107 S.Ct. at 998. The Supreme Court also has noted the confluence

---

[13] U. S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor . . . .").  The right is made applicable to state criminal prosecutions through the Due Process Clause of the Fourteenth Amendment.  *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967).

of its analysis of compulsory process claims and due process protections. *Ritchie*, 480 U.S. at 56, 107 S.Ct. at 1001; *Valenzuela-Bernal*, 458 U.S. at 872, 102 S.Ct. at 3449 (Court has "borrowed much of our reasoning with respect to the Compulsory Process Clause . . . from cases involving the Due Process Clause"). Here, so far as the record shows, the equipment appellant sought was no longer available to Holmes when it was subpoenaed. This factor distinguishes appellant's case from *Martin*. 960 S.W.2d at 840; *see also Dixon v. State*, No. 03-01-00459-CR, 2002 WL 31206210, *2 (Tex.App.–Austin, October 3, 2002 pet. ref'd) (mem. op., not designated for publication) (distinguishing *Thomas* by noting information there sought by defendant was known to exist).

After considering the authorities we have cited and others, we conclude that factor, together with one or more of the following additional factors, takes appellant's claim outside the requirements of due process and of the Compulsory Process Clause: (1) so far as the record shows, not only was the equipment not available, it always was in the hands of Holmes, and its unavailability in no way resulted from any State action, *see Ritchie*, 480 U.S. at 43, 107 S.Ct. at 994 (state child abuse law made information sought confidential); *Thomas*, 837 S.W.2d at 109 (statute then prohibited production of Crime Stoppers records); (2) the record provides no basis to evaluate whether the equipment's availability would have resulted in evidence material or favorable to appellant, *see Washington v. Texas*, 388 U.S. at 16, 87 S.Ct. at 1922 (undisputed that excluded testimony would have been relevant and material); and (3) appellant's cross-examination of Holmes was not limited by the trial court, *see Ritchie*, 480 U.S. at 52-54, 107 S.Ct. at 999-1000 (evaluating contention under Confrontation Clause). We thus conclude the admission of Holmes's testimony concerning appellant's statements

21

she overheard, despite her failure to produce the mechanical means by which she said she overheard them, did not violate appellant's due process or other constitutional rights. We overrule appellant's third issue.

## Conclusion

Having overruled each of appellant's issues, we affirm the judgment of the trial court.

James T. Campbell
Justice

Publish.

Quinn, C.J., not participating.

22