Andre Nathaniel **HAMILTON,**
Appellant

v.

The **STATE** of Texas, **Appellee.**

No. 07–11–0156–CR.

Court of Appeals of Texas, Amarillo.

April 17, 2013.

---

James H. Kreimeyer, Attorney at Law, Belton, TX, for Appellant.

Bob D. Odom, Assistant District Attorney, Belton, TX, for State.

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

## OPINION

PATRICK A. PIRTLE, Justice.

Following a plea of not guilty, Appellant, Andre Nathaniel Hamilton, was convicted by a jury of capital murder [2] and sentenced to life imprisonment without parole. By two issues, he maintains (1) the evidence is legally insufficient to support his conviction when the indictment alleges retaliation against a person other than the victim of the murder as the aggravating circumstance and (2) the trial court erred in admitting the State's computer generated animation. We affirm.

### BACKGROUND FACTS

On Friday, August 22, 2008, Constable Thomas Prado was at the Emerald Green Apartments searching for Derrick Lewis.[3] The apartment manager, Jamie Lujan, and a maintenance worker, Mark Jimenez, informed Prado that Lewis could be located at apartment 214 of the Beverly Arms Apartments, an adjoining complex. Although Lewis was not at that apartment, Jimenez later pointed out a vehicle driven by Appellant, in which Lewis might be a passenger. Prado waved down the vehicle. Although Lewis was not in the vehicle, a passenger, Montreal Wright, was arrested on an outstanding warrant and for carrying a pistol. According to witnesses, Lewis was extremely upset over Wright's arrest.

When Jimenez left work that day, he was at a stop sign when four males made threatening gestures towards him. He called Lujan and told him he would not be coming back to work. Lujan assured him it would be "okay" to return and he did so the following Monday. After returning to work, Jimenez noticed an individual, later identified as Lewis, following him around for a few days while he was picking up the grounds. Because Appellant, Lewis and others were angry with Jimenez for pointing out Appellant's vehicle, which had led to Wright's arrest, they conspired to "get" Jimenez. There was conflicting testimony on whether "getting" Jimenez meant shooting him or beating him.

On August 28, 2008, Jimenez arrived at work at 7:50 a.m. and Lujan was already in the office. They noticed a male, later identified as Anthony Thomas, walk by the office. Thomas had been previously banned from the apartment complex. Jimenez left the office to do some work at a nearby complex. Approximately twenty minutes later, he heard an ambulance.[4] When he returned to the apartment complex, he observed the ambulance as well as police cars. He was told the manager had been shot and saw Lujan being carried out on a stretcher. Lujan suffered five gunshot wounds and on September 1, 2008, he died as a result of multiple gunshots.

---

3. Lewis, a juvenile at the time of the offense who was certified to be tried as an adult, was a co-defendant at Appellant's trial. His appeal was disposed of this same date in appellate cause number 07–11–0444–CR.

2. TEX. PENAL CODE ANN. § 19.03(a)(2) (WEST SUPP. 2012).

4. Lujan called 911 at 8:28 a.m. to report that he had been shot.

Yolanda Evans, a tenant at the Beverly Arms Apartments, testified that she was looking out her window on the morning of the shooting when she observed Appellant, Lewis and Thomas cover their faces with bandanas while standing outside the apartment manager's office at the Emerald Green complex.[5] Soon thereafter, she heard gunshots, followed by three individuals running from the area. Lakeisha Davis, a tenant at the Beverly Arms, testified she heard a noise and looked out her window and saw Appellant, Lewis and Thomas running up the stairs of the Beverly Arms complex. Thomas was carrying a black bag.[6] Another witness testified that she was working on her car when she heard shots and later saw the suspects run into apartment number 112 where Thomas's cousin lived. Thomas's cousin testified that Appellant and Lewis entered his apartment shortly after hearing gunshots and Thomas showed up not long thereafter.

Numerous officers arrived at the scene. After interviewing witnesses, they determined the suspects were holed-up in an apartment at the Beverly Arms. After SWAT arrived, an officer trained as a negotiator was able to convince the three suspects to come out of the apartment and they were arrested. They were identified as Appellant, Lewis and Thomas and they were each subsequently charged with capital murder for causing the death of Lujan while in the course of retaliating against Jimenez.

On the morning of the shooting, Inga McCook, Thomas's girlfriend, was cleaning when she heard a boom similar to a dumpster lid closing. She went to look out her window and saw Thomas carrying a black bag. Suddenly, she realized that Thomas was in her apartment and he told her, "[t]hey shot him. They shot ... the [racial slur]." She ordered him out of her apartment. When he left her apartment, Thomas did not have the black bag on his person.

McCook also testified that Thomas called her from jail to tell her he had hidden the black bag in a Christmas tree box in her bedroom closet. She found the bag, discovered it had two guns inside and drove down a country road to dispose of them. When she returned to her apartment, investigators were waiting to question her and she eventually led them to the area where she had tossed the guns.

Appellant, Lewis and Thomas were each tested for gunshot primer residue. An expert testified that a classic primer mixture consists of three compounds and a particle of primer residue can contain one, two or all three of those compounds. He further testified that a particle that contains all three compounds usually results from the discharge of a firearm. The policy of the Texas Department of Public Safety is that any gunshot primer residue collected more than four hours after a shooting is usually not analyzed because too much time has passed. An exception is made when a district attorney requests testing. However, under those circumstances, interpretations are not drawn from the results.

In the underlying case, Appellant's test was taken outside the four hour window. Notwithstanding the time frame, the re-

---

5. Most witnesses were tenants of the Beverly Arms and from their windows could see the back of the Emerald Green Apartments. An alley separated the two complexes.

6. There was confusion among different witnesses on whether all three suspects ran up the stairs or whether Thomas ran upstairs to hide the black bag before returning downstairs to join Appellant and Lewis in apartment number 112.

sults were consistent with Appellant having fired a weapon or having been in the proximity to or touching a weapon that had been fired. Due to the time frame issue, the expert did not draw any conclusions from those results. Lewis's test, however, was obtained within the four hour window and his results were also consistent with having recently fired a weapon, being nearby when a weapon was fired or contacting some surface with gunshot primer residue on it. Results from the gunshot residue collected from Thomas, which was also timely obtained, did not show any gunshot primer residue particles on his hands, but some was detected on the pocket of his shorts.

Thomas originally agreed to testify against Appellant and Lewis at their trials in exchange for an offer to plead guilty to a lesser included offense. Following this development, the State moved to jointly try Appellant and Lewis. The trial court granted that motion and they were subsequently tried together in the same proceeding. Eventually however, at Thomas's plea hearing, he withdrew from his plea bargain and instead entered a plea of guilty to the offense of capital murder. He testified that he initiated the shooting and "it just wouldn't seem right blaming two individuals that absolutely had, you know, nothing to do with the whole situation, sir." At trial, an excerpt from Thomas's plea hearing was offered into evidence; however, the State's objection was sustained. It was subsequently introduced by the defense for purposes of appeal.

## Analysis

### Issue One—Legal Sufficiency of the Evidence

By his first issue, Appellant maintains the evidence is legally insufficient to support his conviction for capital murder when the indictment alleges retaliation against a person other than the victim of the murder as the aggravating circumstance elevating the offense of murder to capital murder. We disagree.

The only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense the State is required to prove beyond a reasonable doubt is the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex.Crim. App.2010). Under that standard, in assessing the sufficiency of the evidence to support a criminal conviction, this Court considers all the evidence in the light most favorable to the verdict and determines whether, based on that evidence and reasonable inferences to be drawn therefrom, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319, 99 S.Ct. 2781; *Brooks*, 323 S.W.3d at 912. We measure the legal sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex.Crim.App.1997). In our review, we must evaluate all of the evidence in the record, both direct and circumstantial, whether admissible or inadmissible. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex.Crim.App.1999), *cert. denied*, 529 U.S. 1131, 120 S.Ct. 2008, 146 L.Ed.2d 958 (2000). We must give deference to the responsibility of the trier of fact to fairly resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim.App.2007).

A person commits capital murder if he commits murder as defined in section 19.02(b)(1) and intentionally commits the murder in the course of committing or

attempting to commit, among other offenses, the offense of retaliation. TEX. PENAL CODE ANN. § 19.03(a)(2) (WEST SUPP. 2012). A person commits murder if he "intentionally or knowingly causes the death of an individual." *Id.* at § 19.02(b)(1). *See Adames v. State,* 353 S.W.3d 854, 861–62 (Tex.Crim.App.2011), *cert. denied,* — U.S. ——, 132 S.Ct. 1763, 182 L.Ed.2d 533 (2012). A person commits retaliation if he intentionally or knowingly harms or threatens to harm another by an unlawful act in retaliation for or on account of the service or status of another as an informant. TEX. PENAL CODE ANN. § 36.06(a)(1)(A) (WEST 2011). An informant is a person who has communicated information to the government in connection with any governmental function. *Id.* at 36.06(b)(2).

By amended indictment, Appellant was charged with intentionally causing the death of Jamie Lujan ... in the course of committing or attempting to commit the offense of retaliation against Mark Jimenez. The charge instructed the jury on transferred intent, the law of parties and criminal responsibility for conduct of another as follows:

[a] person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated or risked is that:

(1) a different offense was committed; or

(2) a different person or property was injured, harmed or otherwise affected.

A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or both.

Each party to an offense may be charged with commission of the offense.

A person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.

If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

*See* TEX. PENAL CODE ANN. §§ 6.04(b), 7.01(a) & (b), 7.02(a)(2) & (b) (WEST 2011).

■■■ Conspiracy requires an agreement with one or more persons that they or one or more of them engage in conduct that would constitute the offense; and the person or one or more of them performs an overt act in pursuance of the agreement. *See* TEX. PENAL CODE ANN. § 15.02(a) (WEST 2011). The essential element of conspiracy is the agreement to commit the crime. *Williams v. State,* 646 S.W.2d 221, 222 (Tex.Crim.App.1983). A person may be guilty of conspiracy by doing nothing more than agreeing to participate in the conspiracy so long as another co-conspirator does some overt act in furtherance of the conspiracy. *Walker v. State,* 828 S.W.2d 485, 487 (Tex.App.-Dallas 1992, pet. ref'd). However, if the evidence shows there was no actual, positive agreement to commit a crime, the evidence is insufficient to support a conviction for conspiracy. *Brown v. State,* 576 S.W.2d 36, 43 (Tex.Crim.App. [Panel Op.] 1978). Commission of the underlying substantive offense is not an essential element of conspiracy. *McCann v. State,* 606 S.W.2d 897, 898 (Tex.Crim.App. [Panel Op.] 1980).

Since direct evidence of intent is rarely available, the existence of a conspiracy can be proven through circumstantial evidence. *Rhoten v. State*, 299 S.W.3d 349, 351 (Tex. App.-Texarkana 2009, no pet.).

■ Nothing in section 19.03(a)(2) of the Penal Code requires that the intended victim of the aggravating offense must also be the murder victim. *See Chirinos v. State*, 14–09–00919–CR, 2011 WL 166920, at *5 n. 3, 2011 Tex.App. LEXIS 147, at *14 n. 3 (Tex.App.-Houston [14th Dist.] 2011, pet. ref'd). Appellant does not cite this Court to any authority holding otherwise and we see no reason to read such a requirement into the statute.

■ Jimenez provided information to Constable Prado, a government official, on the possible whereabouts of Lewis. Thus, he falls within the definition of an informant for purposes of the retaliation statute. Jimenez testified that he felt threatened when four individuals made gestures to him when he left work the same day he gave that information to Prado. McCook, who lived in an upstairs apartment at the Beverly Arms, testified that Thomas told her Appellant and Lewis blamed Jimenez for Wright's arrest and were plotting against him. Lakeisha Davis testified that she told police two months after the shooting that Appellant, Lewis, Thomas and others were going to "get" the maintenance man [Jimenez]. Although she wavered in her testimony before the jury on whether Appellant was present during the conversation, she did testify that the group talked about shooting the maintenance man.

Byronishia Moore, Lewis's girlfriend and a tenant at the Beverly Arms, testified that she and Lewis went to a motel room with a group a few days after Wright was arrested. While there, they engaged in a conversation about getting the maintenance man. She denied any conversation about killing Jimenez and just thought the group was conspiring to beat him up. We conclude the evidence shows that Appellant conspired with others to harm or threaten to harm Jimenez in retaliation for providing information to Constable Prado which led to Wright's arrest.

Appellant is guilty of Lujan's murder regardless of which conspirator actually fired the fatal shots. Thus, the evidence is legally sufficient to support the jury's verdict that Appellant, as a principal or party, murdered Jamie Lujan while in the course of attempting to commit the offense of retaliation against Mark Jimenez as alleged in the indictment. Issue one is overruled.

ISSUE TWO—ADMISSION OF ANIMATION

By his second issue, Appellant alleges error by the trial court in admitting State's Exhibit 35A,[7] a computer generated three-dimensional ("3–D") time elapse animation that purportedly reconstructs events surrounding the shooting, as viewed from Evans's perspective. The animation is approximately 120 seconds in length and purportedly portrays her view from the bedroom window of her apartment and then from her front door. In the animation three non-descript, identical, 3–D figures are seen standing in the breezeway adjacent to a non-descript single level box-like object, purportedly representing the office at the Emerald Green Apartments. The figures pause for approximately five seconds at the corner of that object and then disappear around a corner to the left. Approximately ten seconds later, seven

---

7. Exhibit 35 is the animation with audio. Exhibit 35A is the animation sans audio. Unless otherwise specifically noted, for purposes of this opinion we will refer to the exhibit simply as "the animation."

loud gun shots are heard, all of the same decibel, but with various time lapses in between each shot. Two seconds after the last shot, the three figures are seen running through the breezeway in the opposite direction until they disappear to the right. The perspective then changes, purportedly moving from Evans's bedroom window to the front door of her apartment. Thirty-two seconds later, the animation portrays a single figure running from left to right across the screen.

Leading up to the admission of the animation, Yolanda Evans testified she knew Appellant and Lewis through their families. Just before the shooting, she was looking out her apartment bedroom window and saw Appellant, Lewis and Thomas standing in the alley near the Emerald Green Apartment office covering their faces with bandanas. When she inquired into their activity, they told her to stop being nosy. She ignored their warning and watched them go around the corner toward the office, which was out of her eyesight. She testified she heard "maybe five" shots and then saw the three individuals running. She witnessed Thomas and Lewis passing something back and forth. She momentarily lost sight of them in a blind spot then heard footsteps going upstairs. She moved from her window to her front door where she witnessed Thomas almost at the top of the stairs. Within seconds, she saw Thomas running down the stairs with a black bag in his hands and "looking scared."

After Evans testified before the jury, in a hearing outside the jury's presence, she was questioned by the State for the purpose of authenticating the animation. While Evans did state that the animation "accurately" depicted the view from her apartment window and then from her front door on August 28, 2008, cross-examination seemed to establish otherwise. Some of the questions related to the lack of a window screen in the animation and the fact that her building sits at a higher elevation than portrayed in the animation. Even though the gunshots in the animation were all the same decibel, other evidence established that the victim sustained wounds from two different caliber weapons, a .22 and .40 caliber. Cross-examination further revealed that while the suspects were of different body weights and heights, the suspects in the animation were identical. Additionally, although the number of gunshots heard in the animation was seven, Evans testified she heard "maybe five."

Numerous objections were lodged to the admission of the animation including relevance, probative value versus unfair prejudice, confusion of the issues, and the inaccurate reflection of Evans's testimony. All objections were overruled and Evans was excused but was asked to leave a contact number.

Although the animation was identified by Evans in her testimony outside the presence of the jury, the State sought to introduce the exhibit before the jury through the testimony of the person who created the animation, Officer Joe Fielder. Fielder testified that using crime scene measurements, photographs, Evans's statements and an accident reconstruction computer software program, he was able to create the animation.

The State then asked to publish the exhibit, whereupon defense counsel requested assurance that the record reflected their prior objections. At that point, the judge asked counsel to approach and inquired as to Evans's whereabouts. He expressed the following concern:

> I just would expect that she should be here to testify to the jury that that's the way it happened. I mean, that's just simple enough, you know. He places it. She looks at it. She says that's the way

it happened. I mean, to me, that's what you need.

The State responded that Officer Fielder was sufficient to sponsor the exhibit before the jury and that Evans had already established its admissibility. In ruling the animation admissible, the judge added, "[s]o, okay, I guess so. But I just—That's not exactly the way I thought it was going to unwind." Defense counsel then made hearsay and confrontation clause objections which were overruled. The exhibit was admitted and played for the jury. In ruling the animation admissible, the trial court likened it to admission of a photograph, a visual aid for the jury. Notwithstanding its ruling, the trial court again expressed concern in Evans not being available during Officer Fielder's testimony to authenticate the animation.

The defense asked to have Officer Fielder qualified as an expert before testifying about the animation. That objection was also overruled. During cross-examination, Officer Fielder admitted to discrepancies in the details of the animation but explained that some details were omitted because they require more memory to run the computer program. He testified that the number of shots heard in the animation was based on the number of shell casings found at the scene. Following Officer Fielder's cross-examination, the trial court announced, "[b]ased on your cross, I'm going to sustain the objection to the audio." Counsel for Appellant commented the ruling was "a little late." Thereafter, the court instructed the jury to disregard the audio portion of the computer generated animation, i.e., the seven gunshots. During redirect testimony, the court excused the jury and asked the parties if they had previously agreed to the animation during pretrial discovery. Defense counsel advised the court that they had only been made aware of it a few days prior to trial. The court reiterated that the animation was admissible, but that the State had not proven the audio portion to be fair and accurate.

Appellant contends the animation was neither accurate nor supported by the testimony because Fielder lacked sufficient personal knowledge of the details it purports to reflect, such as placement of the individuals, elapsed time between distinguishable events, number and volume of gun shots, and the direction and speed of travel of the individuals portrayed, rendering the animation inadmissible. While we agree the trial court erred in admitting the animation, we conclude the error was harmless.

"A computer animation is merely a series of images generated by a computer that serves as demonstrative evidence. It may, for example, illustrate what a witness saw, demonstrate for the jury the general principles that underlie an expert opinion, or depict an expert's theory of how an accident occurred. In each such instance, the evidence may be authenticated by the witness's testimony that the computer animation presents a fair and accurate depiction ... [of] what they purport to represent. If they do not, they will not be admissible." Steven Goode, The Admissibility of Electronic Evidence, 29 Rev. Litig. 1, 10 (Fall 2009).

The use of animations to depict a crime scene has been approved by Texas courts. The State cites Mendoza v. State, No. 13–09–0027–CR, 2011 WL 2402045, 2011 Tex. App. LEXIS 4378 (Tex.App.-Corpus Christi 2011, no pet.) and Murphy v. State, No. 11–10–00150–CR, 2011 WL 3860444, 2011 Tex.App. LEXIS 7230 (Tex.App.-Eastland 2011, no pet.), as authority for the admissibility of such animations. In Mendoza, a computer generated three-dimensional diagram of the crime scene was produced using a commercially available

software program. From that opinion it appears as if the animation depicted nothing more than a three-dimensional rendering of the crime scene showing possible bullet trajectories. In affirming the ruling of the trial court in admitting that evidence, the Corpus Christi Court of Appeals noted that *diagrams* are generally admissible to explain the testimony of a witness and render it more intelligible. 2011 WL 2402045, at *14, 2011 Tex.App. LEXIS 4378, at *41. Nothing in the *Mendoza* opinion approves the use of speculative animations showing anything more than documented facts.

Similarly, in *Murphy v. State*, No. 11–10–00150–CR, 2011 Tex.App. LEXIS 7230 (Tex.App.-Eastland 2011, no pet.), the Eastland Court of Appeals approved the use of a computer generated animation of a crime scene. In *Murphy*, the supporting witness testified that he was a police officer assigned to the traffic division of the Midland Police Department, and that his duties included accident investigations and preparing accident reconstructions. He indicated that the purpose of the animation in question was simply to show the amount of distance covered by two vehicles in a given period of time in order to show the relative positions of the vehicles in the roadway. Unlike the animation in this case, he also testified that all the information and assumptions he used to generate the animation were based on speed and distance information actually known to him or other investigating officers. After reviewing the animation, the court found that the factual discrepancies depicted did not cause the probative value of the evidence to be substantially outweighed by any unfair prejudice from its admission.

 The animations in both *Mendoza* and *Murphy* depicted inanimate objects based on quantifiable measurements. In this case, however, the animation attempts to portray the actions of at least four persons. With respect to animations involving animate objects, the Texas Court of Criminal Appeals has said, "[a]ny staged, re-enacted criminal acts or defensive issues involving human beings are impossible to duplicate in every minute detail and are therefore inherently dangerous, offer little in substance and the impact of re-enactments is too highly prejudicial to insure the State or the defendant a fair trial." *Miller v. State*, 741 S.W.2d 382, 388 (Tex.Crim.App.1987) (quoting *Lopez v. State*, 651 S.W.2d 413, 414 (Tex.App.-Fort Worth 1983), *opinion withdrawn by Lopez v. State*, 667 S.W.2d 624 (Tex.App.-Fort Worth 1984), *which opinion was reversed on other grounds, Lopez v. State*, 664 S.W.2d 85 (Tex.Crim.App.1984). "[T]he artificial recreation of an event may unduly accentuate certain phases of the happening, and because of the forceful impression made on the minds of the jurors by this kind of evidence, it should be received with caution." *Lopez*, 651 S.W.2d at 414 (quoting *People v. Dabb*, 32 Cal.2d 491, 498, 197 P.2d 1, 5 (1948)). This is especially true where the event sought to be depicted is simple, the testimony adequate, and the animation adds nothing more than a one-sided, manipulated visual image to the mental picture already produced in the mind of the jurors by the oral testimony of an eye-witness who has been subjected to the crucible of cross-examination.

 We review a trial court's ruling on the admissibility of this exhibit under an abuse of discretion standard. *Coble v. State*, 330 S.W.3d 253, 272 (Tex.Crim.App. 2010). We must uphold the trial court's ruling if it is within the zone of reasonable disagreement. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex.Crim.App.2000).

 Before State's Exhibit 35 was admitted, the defense asked to have Fielder qualified as an expert. That objection was

overruled and he testified as a lay person. He testified that by using crime scene measurements, photographs, Evans's statements and an accident reconstruction computer software program, he was able to create the animation. Nothing in the record, however, supports many of the details contained in the animation. Those details were provided by nothing more than pure speculation on his part. Accordingly, we conclude the trial court abused its discretion in admitting the computer generated animation.

■■■■ Finding error in the admission of the animation does not, however, end our inquiry. The admission of evidence in violation of an evidentiary rule is non-constitutional error. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex.Crim.App.1998). We must disregard the error if it did not affect Appellant's substantial rights. Tex.R.App. P. 44.2(b). We review the entire record to ascertain the effect or influence on the verdict of the wrongfully admitted evidence. *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex.Crim.App.2011); *Motilla v. State*, 78 S.W.3d 352, 355–56 (Tex.Crim.App. 2002). Reversal is required for non-constitutional error if the reviewing court has grave doubt that the result of the trial was free from the substantial effect of the error. *Burnett v. State*, 88 S.W.3d 633, 637 (Tex.Crim.App.2002). "Grave doubt" means that "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error. Thus, in cases of grave doubt as to harmlessness the petitioner must win." *Id.* at 637–38 (citing *O'Neal v. McAninch*, 513 U.S. 432 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995)).

■■■■ The crux of the case against Appellant was linking him to the conspiracy to get Jimenez. Davis's testimony linked him to an agreement with others to retaliate against Jimenez for giving Con-

stable Prado information which led to the arrest of his friend. The animation did little to answer that question. Moreover, the improper admission of evidence is harmless if the trial record contains other, properly admitted evidence that is probative of the same manner. *See Saldano v. State*, 232 S.W.3d 77, 102 (Tex.Crim.App. 2007). Considering the entirety of the record, including the contested issues, we conclude that Appellant's substantial rights were not affected by admission of the animation and that the error in admitting it was harmless. *See generally Miller v. State*, 741 S.W.2d 382, 388 (Tex.Crim.App. 1987).

As a subsidiary argument in his brief, Appellant complains he was harmed by the trial court's tardy instruction to the jury to disregard the audio portion of State's Exhibit 35 after realizing the audio was not supported by Evans's testimony. Specifically, he asserts the trial court's admonition to the jury was "too little and excessively late."

■■■ It is well established that an instruction to disregard generally cures any error in the improper admission of evidence. *Barefield v. State*, 784 S.W.2d 38, 44 (Tex.Crim.App.1989). An instruction to disregard is a corrective measure because it attempts to cure any harm or prejudice resulting from events that have already occurred. *Young v. State*, 137 S.W.3d 65, 69 (Tex.Crim.App.2004). There is an appellate presumption that an instruction to disregard the evidence will be obeyed by the jury. *Gardner v. State*, 730 S.W.2d 675, 698 (Tex.Crim.App.1987).

■■■ We conclude the trial court instructed the jury to disregard the audio as promptly as possible under the circumstances and disagree with Appellant that the instruction came too late. *See Cordova v. State*, 296 S.W.3d 302, 312 (Tex.App.-

Amarillo 2009, pet. ref'd). We presume the instruction's curative effect was not diminished. *Id.* Issue two is overruled.

### CONCLUSION

Accordingly, the trial court's judgment is affirmed.