

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-24-00043-CR

BRANDON KEITH HARRIS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 188th District Court
Gregg County, Texas
Trial Court No. 54,868-A

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens

# MEMORANDUM OPINION

After a jury found Brandon Keith Harris guilty of capital murder, the trial court sentenced him to life in prison. *See* TEX. PENAL CODE ANN. § 19.03 (Supp.). Harris appeals, maintaining that (1) there was insufficient evidence to support his conviction, (2) the trial court erred when it denied his motion to quash the indictment, and (3) the trial court erred when it admitted evidence of Harris's prior extraneous offenses. We overrule Harris's points of error and affirm the trial court's judgment.

## I.       Background

There are three critical dates in this case: January 6, 2019; January 29, 2020; and January 30, 2020. On January 6, 2019, Harris had a physical altercation with one of his apartment neighbors, Kiara O'Neal. On January 29, 2020, Harris had a meeting with Pancy Daniels, who was the property manager for the Ware Meadows apartment complex (the Meadows). Harris and O'Neal lived at the Meadows. The third date is January 30, 2020, and the events of that day resulted in Harris's arrest for and conviction of capital murder, with the alleged underlying offense of retaliation. The events that occurred on those three dates are interrelated.

### A.       The January 6, 2019, Incident

#### 1.       Pancy Daniels

Daniels testified that, in January 2019, O'Neal, Harris, and Harris's wife, Molly Jarvis, were living at the Meadows. On January 6, 2019, Daniels was made aware of a physical altercation that involved Harris, Jarvis, and O'Neal. Police were called and an arrest was made.

2

Due to the January 6 incident, Daniels terminated Jarvis's lease agreement. She also informed Jarvis and Harris that they were banned from coming on the Meadows property. Daniels did not take any action against O'Neal despite her involvement in the January 6 incident.

### 2. Kiara O'Neal

O'Neal testified that she became acquainted with Harris because they lived at the Meadows at the same time. O'Neal described the beginning of their relationship as "fairly close to each other," and they knew some of the same people. O'Neal stated, "[A]t one point we did become a little more familiar with each other where we had became intimate -- intimately involved at one point, but it wasn't anything of a continuation." She stressed that their relationship was never "romantic" and that, eventually, "[i]t just went right back to being cordial and friends but nothing -- nothing more."

On January 6, 2019, Jarvis, knocked on O'Neal's door and "kind of colorfully" asked O'Neal if she was having a sexual relationship with Harris. Jarvis told O'Neal that Harris had a recording that would confirm that they had been having a sexual relationship. O'Neal testified that she knew Jarvis's assertion was not true, but because she knew that gossip spread like "wildfire" inside the apartment complex, she invited Jarvis into her apartment to discuss the situation. When Jarvis entered O'Neal's apartment, she told O'Neal that Harris was outside. O'Neal stepped outside and saw Harris with a "kind of deranged not-really-here look on his face, like maybe he was intoxicated."

When all three were inside O'Neal's apartment, O'Neal agreed to talk to them about Jarvis's allegation. Because Jarvis told O'Neal that Harris had a recording proving that her

accusation was true, Harris pulled a telephone out of his pocket. He did not show O'Neal the recording but, instead, put the phone back in his pocket. When he removed his hand from his pocket a second time, "he launche[d] for [O'Neal's] throat and that's when [Harris and O'Neal] began fighting. After the pair fought for a while, O'Neal ran into her kitchen to retrieve a knife. When she returned, Jarvis was gone, but Harris was still there. O'Neal testified that she told Harris to leave her apartment, but he refused to leave. At that point, O'Neal exited her apartment and went to a neighbor's apartment. Harris followed her and pushed the neighbor aside so that he could enter the neighbor's apartment to gain access to O'Neal. Upon entry, Harris picked up a lamp and hit O'Neal with it. O'Neal said that she had "another surge of adrenalin," so she placed Harris in a headlock and then took him to the ground where they both remained "for a while."

Not long after that, O'Neal said that she stopped fighting Harris because Jarvis, who had returned, was pleading with her to let Harris go. O'Neal then admitted to Jarvis that she had been in an intimate relationship with Harris. O'Neal testified that Jarvis "didn't like that and she assaulted [her]." O'Neal claimed that Jarvis and Harris "began to jump [her] together." By that time, they were fighting outside of the neighbor's apartment. Another of O'Neal's neighbors, Brian Robinson, heard the disturbance outside and ended up restraining Harris in a choke hold. O'Neal said that she returned to her apartment.

### 3.    Brian Robinson

In January 2019, Brian Robinson lived at the Meadows in apartment 705, which was "right next door" to O'Neal's apartment. Robinson and his family were watching television

4

when Robinson heard O'Neal and Harris fighting. When he opened his front door, he saw "[Harris] grabbing [O'Neal]." Robinson said that Harris had his hands around O'Neal's throat, and he was "like choking her or something." At one point, the pair went into a neighbor's apartment, but they came right back outside. After their return, Harris bent O'Neal over the apartment railing while they continued fighting. Eventually, Robinson "grabbed" Harris and placed him on the ground. When another neighbor tapped Robinson on the shoulder and told him to let go of Harris, Robinson complied with the request. Harris then proceeded to run to his apartment stating that he was going to retrieve his gun. Robinson said that, the minute he heard the word "gun," he ran to a convenience store and said, "Somebody call 9-1-1." He told the person to tell the 9-1-1 operator that "[t]here's a guy out there with a gun trying to kill -- kill everybody or whatever." Robinson said he did not see Harris with the gun because, when he returned from the convenience store, the police had already arrived and were arresting Harris.

**B.     The January 29, 2020, Incident**

**1.     Pancy Daniels**

About a year after the fight between O'Neal and Harris, Harris called Daniels asking her if she would meet him for lunch because "he needed to speak to [her]." After two phone calls from Harris, Daniels told him that she would meet him at a McDonald's restaurant. Daniels's niece, Tia, who worked for Daniels as her assistant, went with her to meet Harris. Daniels said that she did not know Harris very well. She explained, "To say I knew of him, I knew his name,

5

yes. I knew his mother's name and his father's name.[1] I can say that." Tia knew who Harris was, but she did not know him personally.

When Daniels and Tia arrived at McDonald's, Harris was already there. Tia sat down on a stool to wait for an order she had placed. After Daniels and Harris seated themselves in a booth, Daniels noticed that Harris was "[k]ind of antsy like he -- kind of like he had something on his mind, a little irritated." Daniels said that Harris wanted to discuss his court case that related to the January 6, 2019, incident between Harris and O'Neal. Harris told Daniels that his 2019 court case was going to be tried in the "next day or two" and that he was looking at a potential ten-year prison term if he was found guilty. Harris asked Daniels to write "a character letter statement" to the trial court. Daniels told Harris that she was not present when the incident took place "the year before with him pulling a gun out; also that writing a statement like that was something personal, and [she] just couldn't."

Daniels also informed Harris that she could not have a discussion about O'Neal because she was a resident at the Meadows. Harris asked Daniels whether she "could not" or "would not" discuss the incident, to which, Daniels said she "would not." According to Daniels, Harris became "irritated" by her response. After their brief conversation, Harris got up to leave the restaurant, at which time Harris said, "[A]nybody can take a loss." Neither Tia nor Daniels knew what Harris's comment meant.

---

[1]Harris's parents also lived at the Meadows.

### C.   January 30, 2020[2]

#### 1.   Pancy Daniels

The following day, Daniels went to the Meadows to begin work at 8:30 a.m.   Around 9:30 a.m., Daniels left work to go to a doctor's appointment.   She returned to her office around 11:15 a.m.   According to Daniels, the incident at issue occurred about five minutes after she returned.   There were only two people in the office, Daniels and Tia.   Daniels's and Tia's desks were situated in "an L-shape," with Tia facing the door to the office and Daniels's desk on the left side.

Describing the incident, Daniels explained that she saw Harris walk past the office window, and then he walked through the office door.   Daniels said, "He snatched the door open. And I was standing -- when he snatched the door open, because we knew he wasn't supposed to be there on the property."   She continued, "And when he pulled the door open, Tia said, oh, my God, he has a gun."   When Daniels walked toward the counter, she saw Harris holding the gun. Harris lifted up the gun and said something like, "I came to see you today."   Daniels was confused because she could not understand why Harris would come to see her with a gun in his possession.   Daniels stated that he "lean[ed] up like towards [her] with the gun . . . and then back towards Tia."   Tia said, "[N]o, don't shoot."   Daniels ran toward the bathroom area and waited for Tia to join her there.   While Daniels was thinking of what she should do next, she heard Tia say, "[N]o, please don't shoot."   Daniels recounted, "She was begging for her life . . . ."

---

[2]Many witnesses testified at trial about the January 30 incident.  However, we include those portions of testimony that are most germane to the issue of whether the evidence was sufficient to support the jury's guilty verdict.

Describing what happened next, Daniels explained, "And when I heard a gunshot go off, that's when I started trying to unlock that bathroom door to get out." She continued, "And it just felt like I couldn't unlock the door to get out, and that's when I started to unlock the door to run out and get inside of the laundry room . . . and . . . exit out of that other door." After exiting the building, Daniels could still hear gunfire, which she believed was "so close to [her] to where it almost felt like it was on top of [her]." Daniels continued running but said her "legs just kept continuing to buckle and [she] continued to fall." She eventually dragged an older gentleman, who had been standing outside, into his apartment where Daniels believed they would be safe. While in the apartment, Daniels called 9-1-1 for help. When asked about Harris's demeanor, Daniels said, "He seemed to be calm, honestly."

It was not long before police officers arrived on the scene. Daniels told them that she believed Harris was on his way back to O'Neal's apartment. Daniels said, "I just figured that she would be next. . . . Because he had asked about her the day before." Later that day, Daniels learned that Tia did not survive.

### 2.    Skyler Long

Sklyer Long testified that, on January 30, 2020, he was living at the Meadows. While Long was inside his apartment, something drew his attention away from what he was doing. When Long looked out the window, he saw Harris[3] "[go]ing down the sidewalk with a gun, walking inside the office building." Long described what he saw and heard:

---

[3]Long testified that he could not remember the shooter's name because the incident had taken place four years before the trial commenced. Yet, he identified Harris at trial as being the person he saw on January 30, 2020.

> [Harris] went inside the office. I heard a gunshot and then he came outside the office, walked down the sidewalk, walked in front of my apartment, dropped a clip out -- dropped the extra clip, reached down, picked it up, walked on the side of the building and started shooting again.

After Harris went around the corner of a building, Long was unable to see him, but he did hear some additional gunshots.

### 3.    Kiara O'Neal

On January 30, 2020, O'Neal was living at the Meadows, but Harris and Jarvis were no longer living there. O'Neal remembered what she was doing on January 30 because she was pregnant and was not feeling well. The father of her children, Deyatta Hodge, was also in the apartment that day. O'Neal was in bed when Hodge brought her some food. According to O'Neal, Hodge "all of a sudden" jumped and then asked her if she heard "that noise." O'Neal thought the noise was coming from the television or the truck that picked up trash for the apartment complex. O'Neal stated that it was just "loudness . . . just a lot of loudness." She said, "And once I had knew what was going on, it was because [Harris] started kicking my door. And he did this really menacing voice and was like knock, knock, and that's how I knew it was him.[4] And I began to hear glass shatter in the front of my apartment."

O'Neal and Hodge hid inside of a closet "[w]aiting to see if [Harris] was going to get in or if he was going to leave. Just waiting." Harris was at O'Neal's locked front door, and he was attempting to "kick the door down." Around that same time, Harris tried to shoot through the deadbolt. He also shot out one of the windows. Later, bullet fragments were found in her

---

[4]O'Neal described Harris's voice as being "very rough" and sounding like "The Shining when Jack Nicholson sticks his head through the door like that, literally, [was] all [she] ke[pt] envisioning."

refrigerator.  She stated, "I had to get an entirely new refrigerator."  O'Neal was told to consider the context of her relationship with Harris, and then was asked if she had any idea as to why Harris was trying to get in her apartment.  O'Neal responded, "Of course I have an idea."

### 4.     Kirk Talley

Kirk Talley, who lived at the Meadows in January 2020, testified that he heard gunfire while he was walking to his car.  Talley explained that his vehicle was parked "[l]ike near the front but close to the office but like to the side."  Talley said that it sounded like the shot came from "around the building because [he] heard it on [his] right side and [his] right side is like going to the office."  Believing that he may have heard a nail gun, and out of curiosity, Talley looked around to see what was happening.  Talley said that he saw Harris walking around the corner, and "[h]e was picking up something off the ground."  According to Talley, Harris then aimed a rifle at him.[5]  Talley stated, "[Harris] aimed it at me and pulled the trigger, and I guess it jammed because, you know, you know you got a gun jam,[6] and that's when I took off."  Talley ran toward the back of the building in an effort to get away from Harris.  While he was running, Harris came into Talley's view a second time.  Talley said, "[Harris] fired -- I guess he got his gun corrected.  He reloaded.  He started firing."  Talley continued running until he saw Delia Payne, who lived in apartment 206, and her granddaughter, Nala Neeley, who lived with her mother in apartment 705.[7]  Talley told them that "they needed to take . . . shelter somewhere

---

[5]Talley testified that the rifle was an "AK-47, something like that.  It was long."

[6]Talley said that he believed the gun jammed because he heard "a default clicking noise."

[7]Neeley testified that she was aware that Robinson and his family previously lived in apartment 705.

because [Harris was] coming." The three of them "ended up in [Neeley's] house."[8] Talley explained, "[The lady] was trying to get her keys in the door and her nerves were so bad, you know, it was kind of hard for her to, you know, basically get the key in there because [of] her nerves." He continued, "And by the time we got the key in the door and stuff and soon as we open[ed] the door, [Harris] was coming around the corner."

According to Talley, he saw the barrel of Harris's gun "and that's when [Harris] shot one more time, . . . shot another round." Talley said it was "by the grace of God . . . [Harris] didn't hit no one." Talley told Payne and Neeley to go to the back room, get in the closet, and not to come out until it was safe. Talley said that Harris began kicking the door and shooting through the apartment window in an unsuccessful attempt to enter the apartment.[9] Talley explained, "He was saying something about coming outside -- like, y'all come outside, come outside, don't hide." Not long after that, police officers arrived at the apartment complex.

### 5. Brandon Robinson

At trial, Robinson stated that he and his family did not live at the Meadows at the time of the January 30, 2020, incident. He said that, when they lived at the Meadows, their apartment was located "right next door to [O'Neal]," who lived in apartment 707. When asked why he and his family moved out of the Meadows, Robinson explained that they moved out a "little while

---

[8]Talley incorrectly assumed that the apartment in which they took shelter belonged to Payne. When he was asked to point on a diagram to which apartment they went into, he pointed in the 705 or 706 area, and not to an area anywhere near Payne's apartment 206.

[9]Additional witnesses testified that they saw Harris with a rifle on the apartment grounds, and in some instances, they saw him shoot toward them and/or shoot into apartment windows.

after [the January 6 incident] had happened because [he] had a bad feeling that [Harris] was going to come back and do something, so [Robinson] took [his] family and left."

### D.    Harris's Custodial Interview

After officers placed Harris under arrest, he was taken to the police department and interviewed by Officer Armando Juarez-Ortega.[10]  Upon entering the interview room, Juarez-Ortega asked Harris if he knew why he was there, to which Harris responded, "I'm pretty sure you know."  Harris was told that the ammunition in his rifle would most likely match the casings at the scene.  Harris responded, "Here's what I know man.  Then put this on your little camera.  I don't give a f*ck."  Harris admitted that he "shot a woman multiple times at point blank range with an AR."  He continued,

> I watched those bullets go into her.  From the first moment, that b*tch hid under that desk, it was amusing to me.  Well see, here's the thing.  She wasn't even the n****r talking.  I wanted to get that b*tch that ran that office.  But, like the coward b*tch she is, she ran.  See, here's the thing.  Ahh, you know I know I'm never gonna see the light, see the light again.  I was due in court by tomorrow what for two felonies.  So, I know I'm gonna be buried either way it go.  The only regret I have . . . is not killin' the motherfu*kers that, what they wrongfully did to me.

Discussing the January 6, 2019, confrontation with O'Neal, Harris claimed that he was arrested "for intervening on the behalf of [his] wife."  He continued, "[B]ut the crooked-a*s Longview Police Department . . . made this all seem like [O'Neal] was the victim even though I'm the only person out of this whole scenario that required staples and stiches."  Pointing out his stature, Harris said that he was six foot two, two-hundred forty-seven pounds and, noting that O'Neal weighed much less than he did, there was no way that she could have overpowered him.

---

[10]The trial court admitted the recording of the interview into evidence, and the State played it for the jury.

Harris referred to his fists as "damn near sledgehammers," and he said that, if he had intended to hurt O'Neal during the January 6, 2019, incident, he could have caused her "damage." Harris claimed, "This bit*h said I repeatedly hit her but yet only had a mark on her nose from where she fought my wife." Opining that the law enforcement community did not care about the truth, Harris said that he had attempted to prove his innocence by being honest about the January 6, 2019, incident.[11] He said that he tried to be respectful to everybody.

Referring to Robinson, Harris said, "In the [police] report [of the January 6 incident], they didn't even have that the fat-f*ckin dude chocked me out." Harris continued, "Do I agree that when I went over there today that he should have got it? Because trust and believe if I had saw this punk a*s, would that bi*ch in that . . . what happened that office? [Robinson would have] gotten way worser. Y'all woulda found this n****r with no face."

Harris went on to assert that the police officers could not "think that someone such as [himself] just woke up one day and decided to flip-out." He stated, "I didn't have a fu*kin' mental break, I didn't have none of these things." Maintaining that the justice system had been unfair to him, Harris stated, "[T]he law is corrupt and its been that way."

Harris also explained the reasoning behind his desire to meet with Daniels at McDonald's. According to Harris, he met with Daniels because he was "thinking about calling her as a material witness" during his trial of the January 6, 2019, incident" "so she [could] attest to the fact that" the police had never been called on him while he was living at the Meadows. "And, then [Daniels] could attest to the fact that [O'Neal] had to have slept with half of the

---

[11] Harris was referring to the fact that he and his wife went to the police department to tell them what happened during the incident but, according to Harris, an officer told them to leave.

[Meadows'] residents, including, [Daniels's] husband." Harris said that he had not expected to see Tia with Daniels at McDonald's.

When asked about who his intended victim was, Harris said, "Did I want to shoot [Daniels], absolutely. . . . I believe certain people shouldn't exist in life." In support of his reasoning, Harris explained that Daniels had committed fraud while she was managing the Meadows by "circumventing" the rules. According to Harris, he lived at the Meadows with his wife for about six years, but he did not have a written lease agreement, and he never paid rent. Referring to Daniels, Harris claimed that he did not shoot at "a righteous bi*ch." Instead, he shot at a "cut-throat bi*ch."

Harris also stated that everyone involved that day was trying to "play [him]" and "f*ck [him] over." After explaining to Harris that officers found bullets in building 700, Juarez-Ortega asked him why he shot that building, to which Harris answered, "Shoot the other building, huh? . . . You know why I shot those buildings? Cause the people I just got through describing to you . . . and the actions they [took against me] . . . that's where they live."

When describing his feelings about shooting Tia, Harris said that he "imagined that pulling the trigger [wa]s just like making friends. . . [b]ecause [it was] easy." He said, "[P]ulling the trigger is so easy a child could do it." Harris stated that he did not know the name of the young woman he shot, but he knew her as "being [Daniels]'s so-called niece or whatever." Harris said, "You know what man, [Tia] didn't even deserve that sh*t . . . to tell you the truth, she really didn't. I felt bad for her." Harris conceded that, during the shooting, he had a

14

magazine in the rifle and a magazine in his pocket. When Harris was informed that Tia passed away, he showed very little, if any, emotion.

## II. Sufficient Evidence Supports the Jury's Verdict

In his first point of error, Harris argues that the evidence was insufficient to support his conviction of capital murder because the State failed to prove beyond a reasonable doubt the underlying offense of retaliation.

### A. Standard of Review

"In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019 pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007))).

"Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge." *Id.* at 298 (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "The 'hypothetically correct' jury charge is 'one that accurately sets

15

out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at 240).

"In our review, we consider 'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'" *Id.* at 297 (quoting *Hooper*, 214 S.W.3d at 13 (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985))). "It is not required that each fact 'point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 13). "Circumstantial evidence and direct evidence are equally probative in establishing the guilt of a defendant, and guilt can be established by circumstantial evidence alone." *Id.* (citing *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13). "Further, 'we must consider all of the evidence admitted at trial, even if that evidence was improperly admitted.'" *Id.* at 297–98 (quoting *Fowler v. State*, 517 S.W.3d 167, 176 (Tex. App.—Texarkana 2017) (citing *Moff v. State*, 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004)), *rev'd in part by* 544 S.W.3d 844 (Tex. Crim. App. 2018))).

The jury, as "the sole judge of the credibility of the witnesses and the weight to be given their testimony[, could] 'believe all of [the] witnesses' testimony, portions of it, or none of it.'" *Id.* at 297 (second alteration in original) (quoting *Thomas v. State*, 444 S.W.3d 4, 10 (Tex. Crim. App. 2014). "We give 'almost complete deference to a jury's decision when that decision is

based upon an evaluation of credibility.'" *Id.* (quoting *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008)).

**B.     Discussion**

Here, the State's indictment against Harris alleged, in part, as follows:

> [O]n or about the 30th day of January, 2020 and anterior to the presentment of this Indictment, in [Cass County, Texas], BRANDON KEITH HARRIS, hereinafter called Defendant, did then and there intentionally cause the death of an individual, namely [Tia], by shooting [her] with a firearm, and the Defendant was then and there in the course of committing or attempting to commit the offense of retaliation.[12]

Harris does not claim that the State presented insufficient evidence to prove that he shot and killed Tia. But the State charged him with the more serious offense of capital murder, with the underlying offense of retaliation, which is the basis of Harris's complaint.

A person commits the offense of capital murder when he "*intentionally commits the murder in the course of committing or attempting to commit*," among other offenses, "obstruction or retaliation." TEX. PENAL CODE ANN. § 19.03(a)(2) (emphasis added). Section 36.06(a)(1)(A) of the Texas Penal Code states, "[A] person commits an offense [of retaliation or obstruction] if the person intentionally or knowingly harms or threatens to harm another by an unlawful act . . . in retaliation for or on account of the service or status of another as a . . . public servant, witness, prospective witnesses or informant." TEX. PENAL CODE ANN. § 36.06(a)(1)(A).

The chief purpose of the retaliation statute "is to encourage a specified class of citizens— which includes public servants, witnesses, prospective witnesses, and informants—to perform vital public duties without fear of retribution." *Cada v. State*, 334 S.W.3d 766, 771 (Tex. Crim.

---

[12]The indictment also alleges a punishment-enhancement paragraph.

App. 2011). "Those public duties may include reporting criminal activities, testifying in official proceedings, or cooperating with the government in a criminal investigation." *Id.* (quoting *Morrow v. State*, 862 S.W.2d 612, 615 (Tex. Crim. App. 1993)). Section 36.06 of the Texas Penal Code "seeks to encourage such participation without fear of retribution. A review of the distinct categories of persons protected leads to the conclusion that the legislature attempted to account for every category of person who might possess information regarding criminal activity which may lead to the apprehension of a criminal offender." *Morrow State*, 862 S.W.2d 612, 615 (Tex. Crim. App. 1993).

The word "witness" has been described as a person "who *has* testified in an official proceeding." *Cada*, 334 S.W.3d 770 (quoting *Jones v. State*, 628 S.W.2d 51, 55 (Tex. Crim. App. [Panel Op.] 1980). But "[a]ny person who is involved in an offense with a defendant, who sees the defendant committing an offense, or who hears the defendant discuss committing an offense is a 'prospective witness' in the prosecution of that defendant because he 'may' testify." *Ortiz v. State*, 93 S.W.3d 79, 86 (Tex. Crim. App. 2002). The determination of whether a person is "prospective witness" is determined from the viewpoint of the retaliating party. *Solomon v. State*, 830 S.W.2d 636, 637 (Tex. App.—Texarkana 1992, pet. ref'd).

First, Harris contends that the State failed to prove that he was guilty of capital murder because Tia was not a prospective witness to the January 2019 assault; hence, she was not Harris's retaliation victim. More simply put, according to Harris, the victim of the murder must also be the victim of the retaliation. This Court agrees with Harris that Tia was not a prospective witness to the January 2019 assault. But contrary to the remainder of his argument, the capital

18

murder statute does not necessitate that the victim of the aggravating circumstance also be the victim of the murder.  *See* TEX. PENAL CODE ANN. § 19.03.

In support of his position, Harris cites multiple capital murder cases with underlying offenses such as burglary or aggravated sexual assault.  *See Alba v. State*, 905 S.W.2d 581 (Tex. Crim. App. 1995); *Marquez v. State*, 725 S.W.2d 217 (Tex. Crim. App. 1987); *overruled on other grounds by Moody v. State*, 827 S.W.2d 875 (Tex. Crim. App. 1992).  Harris contends that those types of cases are more easily analyzed than the present one because, for example, it is not uncommon for a person in the process of burglarizing a home or establishment to murder someone other than the owner.

Yet, in *Hamilton v. State*, 399 S.W.3d 673 (Tex. App.—Amarillo 2013, pet. ref'd), Hamilton was tried for capital murder with the aggravating offense of retaliation.  The State alleged that Hamilton conspired with other individuals to kill a witness named Mark Jiminez, but instead killed a person named Jamie Lujan while in the course of attempting to commit retaliation against Jimenez.  *Id.* at 679.  Jimenez had provided information to a constable as to where he could locate a man named Derrick Lewis.  *Id.* at 680.  At trial, Jimenez testified that, on the same day he told the constable about Lewis's location, four individuals made gestures at him when he left work and that he felt threatened by them.  Another witness testified that she told the police that Hamilton, Lewis, and others "were going to 'get'" Jiminez.[13]  *Id.*  Lewis's girlfriend, Byronishia Moore, testified that she and Lewis went to a motel room with a group of individuals

---

[13]That witness later "wavered in her testimony before the jury on whether [Hamilton] was present during the conversation, she did testify that the group talked about shooting the maintenance man."  *Hamilton*, 673 S.W.3d at 680.

and discussed "getting" Jiminez. *Id.* Moore "denied any conversation about killing Jimenez and just thought the group was conspiring to beat him up." *Id.* Subsequently, Lujan was shot, and he died a few days later. *Id.* at 676. After investigators interviewed witnesses, the suspects were identified as Hamilton, Lewis, and a man named Thomas. *Id.* at 677. They were all charged with capital murder. *Id.* After a jury trial, Hamilton was found guilty of the charged offense. *Id.* at 676.

On appeal, Hamilton maintained that the State's evidence was insufficient because the indictment alleged retaliation against a person other than the murder victim. *Id.* at 678. The Amarillo Court of Appeals determined that there was sufficient evidence to support Hamilton's capital murder conviction even though Hamilton was not the actual shooter, explaining that

> [Hamilton wa]s guilty of Lujan's murder regardless of which conspirator actually fired the fatal shots. Thus, the evidence is legally sufficient to support the jury's verdict that [Hamilton], as a principal or party, murdered Jamie Lujan while in the course of attempting to commit the offense of retaliation against Mark Jimenez as alleged in the indictment.

*Id.* at 680.

Harris concedes that he has no caselaw in support of his position that capital murder, with the aggravating offense of retaliation, should be treated any differently than cases involving other aggravating offenses. And, although caselaw is scant in regard to the exact set of circumstances before us, we do have some guidance. *See id.* Furthermore, we have not been provided any legal authority to the contrary. For these reasons, we find, that the State was not required to prove beyond a reasonable doubt that Tia was both the murder victim and the retaliation victim for the jury to have found Harris guilty of capital murder.

Next, Harris contends that none of the named retaliation victims (Daniels, O'Neal, and Robinson) were witnesses or prospective witnesses to the January 6, 2019, incident. We disagree.

The day before the shooting occurred, Harris met with Daniels, and he immediately brought to Daniels's attention his impending court date on the charge stemming from the altercation with O'Neal on January 6. As far as the record shows, Harris and Daniels did not discuss anything other than the court setting, which was the next day; Harris's request for Daniels's involvement in his case; and Harris's desire to talk about the victim in his case. For instance, within minutes of sitting down at McDonald's, Harris asked about O'Neal, and when she refused to have that discussion, Harris became irritated and left the restaurant,[14] leaving Daniels and Tia wondering what Harris's ominous-sounding statement—"anybody can take a loss"—actually meant.

Further, Daniels knew enough about the January 6 assault to make it the basis for her decision to order Harris and Jarvis to move out of their apartment and then ban them from ever returning to the Meadows property. The same holds true regarding Daniels's decision to refrain from banning O'Neal. In sum, Daniels had information that could have been pertinent to Harris's trial. And, although she had not been subpoenaed to testify as of that day, that fact, alone, makes little difference in our analysis.[15]

---

[14]Daniels said they were at McDonald's about the length of time it took Tia to order her food and then get it. They left as soon as she received her order.

[15]In *Solomon*, Solomon had been charged with and convicted of the offense of retaliation. At trial, the State presented evidence showing that the complaining witness, Jennifer Qualls, who was a prostitute, "took a wallet and money" from one of her male customers and "gave them to Solomon, with whom she was associated." *Solomon*,

Moreover, Harris's statements during his interview made it even more evident that he believed Daniels was, at the very least, a prospective witness. In fact, Harris stated that he was "thinking about calling [Daniels] as a material witness" to the January 6 incident "so [Daniels could] attest to the fact that" the police had not ever been called on him while he was living at the Meadows. He also stated that Daniels could have testified in his defense that O'Neal had "slept with half of the [Meadows'] residents."

When we review the circumstances from Harris's point of view, he clearly believed that Daniels had knowledge of, or had participated in, the events surrounding the January 6 incident. As a result, Daniels could have been considered by the jury as a prospective witness at Harris's trial.

In addition, it is obvious that O'Neal and Robinson were prospective witnesses to the January 6 altercation—O'Neal, as the victim of the altercation, and Robinson, as an eyewitness to it. We, therefore, find that a rational jury could have concluded that Daniels, O'Neal, and Robinson were prospective witnesses in Harris's assault case.

Additionally, Harris argues that, even if Daniels, O'Neal, and Robinson were prospective witnesses, Harris did not murder any of them. Instead, he murdered Tia. Harris argues that the evidence is insufficient to show that he retaliated against any of the prospective witnesses since

830 S.W.2d at 636. Solomon hid the items in a basket inside of a closet. *Id.* at 636. Qualls was arrested, and Solomon was charged with the offense of felony theft. *Id.* at 636–37. Qualls testified that Solomon attempted to "dissuade her from testifying against him and expressly threatened to kill her if she became a witness." *Id.* at 637.

On appeal, Solomon maintained that the evidence was insufficient to show that Qualls was a prospective witness because there was no trial date set, and Qualls had not been notified that she would be a witness at trial. *Id.* This Court determined that "the offense [wa]s complete even though Qualls [had] not [been] formally called as a witness, or even if there was not at that time a charge pending against Solomon." *Id.* As a result, this Court found that there was sufficient evidence to show that Qualls was a prospective witness. *Id.*

his actions toward all of them took place after he murdered Tia, not while in the course of committing the offense.

As used in Section 19.03(a)(2), "in the course of committing" the offense means "conduct occurring in an attempt to commit, during the commission, or in the immediate flight after the attempt or commission of the offense." *Robertson v. State*, 871 S.W.2d 701, 705 (Tex. Crim. App. 1993). Harris misconstrues Section 19.03(a)(2) as it applies to this case.

During his interview, Harris, who was obviously obsessed with the way he had been treated on January 6, said that he was angry with Daniels because she refused to favorably assist him with his trial stemming from the January 6 incident. Harris had no problem admitting that he intended to kill her the day he showed up at her office with a rifle. When he arrived, Harris did not suddenly change his mind and decide that he would not shoot Daniels. Instead, he failed to follow through with his intention only because of Daniels's quick escape from the office. Harris then shifted his attention to Tia, who he knew was Daniels's niece. After intentionally shooting Tia at point-blank range, multiple witnesses testified that Harris immediately went on a rampage in the Meadows apartment complex.

After shooting Tia, Harris did not stop at any point before locating O'Neal's apartment, where he began shooting through the apartment's windows and doors. Daniels even told an officer at the scene "[t]hat he was probably going in the back to [O'Neal]'s apartment." Daniels recalled Harris asking about O'Neal the day before, and she said, "I just figured that [O'Neal] would be next." The jury could have reasonably inferred that Harris went to the Meadows intending to shoot Daniels and O'Neal because he was armed with enough ammunition to shoot

23

multiple people, and he went directly to the locations in the apartment complex where he knew they would be—Daniels in the office, and O'Neal in her apartment.

The same is true of Robinson even though he was not living at the Meadows on January 30. There is no evidence that Harris knew that Robinson and his family had moved out of the apartment complex. In fact, it was reasonable for the jury to conclude that Harris believed that Robinson still lived in the 700 building because, immediately after Harris shot at O'Neal's 707 apartment, he began firing into apartment 705, which was where Robinson and his family previously resided. Furthermore, during his interview, Harris made it clear that he intended to shoot Robinson—or do something even worse to him—specifically because Robinson attempted to restrain Harris on January 6 and because he was the person who reported the incident to law enforcement.[16]

In conclusion, we find that there was sufficient evidence for a rational jury to conclude that (1) Daniels, O'Neal, and Robinson were prospective witnesses in Harris's assault case, (2) Tia was killed during the course of Harris attempting to commit the offense of retaliation, and (3) Harris intended to retaliate against all three prospective witnesses—Daniels, O'Neal, and

---

[16]In Harris's brief, he contends, under another point of error, that the evidence was insufficient to support the State's theory that Harris "ha[d] **already concocted a plan of action that include[d] retaliation**." Specifically, Harris directs this Court to the definition of "in the course of" and argues that "there [wa]s no evidence that [he] intended to seek out and pursue any of the persons named belatedly in the Charge of the Court" "**prior to or commensurate with [Tia's] murder**."

As far as Daniels is concerned, according to his own recitation of the incident, Harris certainly knew prior to killing Tia that he intended to kill Daniels. As to the other two retaliation victims, O'Neal and Robinson, the jury was free to believe, based on Harris's interview with Juarez-Ortega, that he "concocted" the plan to terrorize them either before or at the time he shot Tia. In addition to his own seemingly obsessed thoughts of the January 6 incident and how he was mistreated by all of the retaliation victims, the jury could have also considered that Harris never paused during his rampage. He had the opportunity to do so many times, including at the beginning of the incident when Daniels fled to safety. But he chose not to do that. Instead, he immediately, and without time to plan, began terrorizing Meadows residents—specifically O'Neal and a person he thought was Robinson, whom he directly refers to multiple times in his interview.

Robinson—after he unsuccessfully attempted to kill Daniels and during his immediate flight from killing Tia. As a result, we overrule Harris's first point of error.

## III. The Trial Court Did Not Err When It Denied Harris's Motion to Quash

In his second point of error, Harris maintains that the trial court erred when it denied his motion to quash the indictment because it did not identify the victim of the alleged retaliation. According to Harris, because of the State's failure to identify the victim, the indictment did not give Harris adequate notice of the charge against him.

### A. Standard of Review

"The sufficiency of the indictment presents a question of law." *State v. Zuniga*, 512 S.W.3d 902, 906 (Tex. Crim. App. 2017) (citing *Smith v. State*, 309 S.W.3d 10, 13 (Tex. Crim. App. 2010)). "Appellate courts review a trial judge's rulings on a motion to quash a charging instrument *de novo.*" *Id.* (citing *State v. Barbernell*, 257 S.W.3d 248, 251–52 (Tex. Crim. App. 2008)). Yet, "[t]he trial court's ruling should be upheld if it is correct under any theory of law applicable to the case." *Id.* (citing *State v. Rhinehart*, 333 S.W.3d 154, 161 (Tex. Crim. App. 2011)).

"The Texas and United States Constitutions grant a criminal defendant the right to fair notice of the specific charged offense." *Id.* (citing U.S. CONST. amend. VI; TEX. CONST. art. 1, § 10; TEX. CONST. art. V, § 12b; *Lawrence v. State*, 240 S.W.3d 912, 916 (Tex. Crim. App. 2007)). "The charging instrument must convey sufficient notice to allow the accuse[d] to prepare a defense." *Id.* (quoting *Curry v. State*, 30 S.W.3d 394, 398 (Tex. Crim. App. 2000)). "Toward that end, Chapter 21 of the Texas Code of Criminal Procedure governs charging

instruments and provides legislative guidance concerning the requirements and adequacy of notice." *Id.* (citing *State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004)).

"With respect to indictments, Article 21.02 sets out what facts must be included in an information and states, in part, that '[t]he offense must be set forth in plain and intelligible words.'" *Id.* (alteration in original) (quoting TEX. CODE CRIM. PROC. ANN. art. 21.02(7)). "Article 21.03 . . . provides that '[e]verything should be stated in an indictment which is necessary to be proved.'" *Id.* (alteration in original) (quoting TEX. CODE CRIM. PROC. ANN. art. 21.03). "Finally, Article 21.04 provides that '[t]he certainty required in an indictment is such that will enable the accused to plead the judgment that may be given upon [him] in bar of any prosecution for the same offense.'" *Id.* (first alteration in original) (quoting TEX. CODE CRIM. PROC. ANN. art. 21.04).

"[I]n most cases[,] a charging instrument that tracks the statutory text of an offense is sufficient to provide a defendant with adequate notice." *Id.* at 907 (citing *Barbernell*, 257 S.W.3d at 251). But, "when the statutory language fails to be completely descriptive," or "when a statute defines the manner or means of commission in several alternative ways, [and] an indictment . . . neglects to identify which of the statutory means it addresses," the indictment may be insufficient. *Id.* "In such cases, more particularity is required to provide adequate notice."[17] *Id.*

---

[17]As a result, a reviewing court should "engage in a two-step analysis when analyzing whether a charging instrument provides adequate notice." *Zuniga*, 512 S.W.3d at 907 (citing *State v. Jarreau*, 512 S.W.3d 352, 354–55 (Tex. Crim. App. 2017)). We first "identify the elements of the offense." *Id.* Then, the reviewing court "must consider whether the statutory language is sufficiently descriptive of the charged offense." *Id.* (citing *Jarreau*, 512 S.W.3d at 354–55; *State v. Mays*, 967 S.W.2d 404, 407 (Tex. Crim. App. 1998)). "[T]he elements, defined by the Legislature, include: the forbidden conduct, the required culpability, if any, any required result, and the negation of any

26

"Texas law does not permit a defendant in a criminal case to attack the sufficiency or adequacy of an indictment by evidence beyond the four-corners of that indictment." *State ex rel. Lykos v. Fine*, 330 S.W.3d 904, 919 (Tex. Crim. App. 2011) (orig. proceeding). "[T]he critical determination is whether the trial court (and reviewing appellate courts) and the defendant can identify what penal-code provision is alleged and whether that penal-code provision is one that vests jurisdiction in the trial court." *Kirkpatrick v. State*, 279 S.W.3d 324, 328 (Tex. Crim. App. 2009) (citing *Teal v. State*, 230 S.W.3d 172, 180 (Tex. Crim. App. 2007)).

**B.      Discussion**

As pointed out by Harris, the alleged retaliation victims were not named in the indictment. But, in a capital murder case, the Texas Court of Criminal Appeals has "repeatedly held that an indictment need not allege the constituent elements of the underlying offense which elevates murder to capital murder." *Buxton v. State*, 526 S.W.3d 666, 680 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (quoting *Alba*, 905 S.W.2d at 585).

The State's indictment against Harris followed the statutory language contained in Section 19.03(a)(2) of the Texas Penal Code, which describes the offense of capital murder.[18]

As mentioned above, Harris concedes that he is unable to cite to any legal authority to support his argument that this Court should treat an indictment in a capital murder case, involving an underlying offense of retaliation, any differently than the general rule stated above.

exception to the offense." *Barbernell v. State*, 257 S.W.3d 248, 255 (Tex. Crim. App. 2008) (citing TEX. PENAL CODE. ANN. § 1.07(22)).

[18]Section 19.03(a)(2) states that an individual commits capital murder when he intentionally commits murder as described in Section 19.02(b)(1) of the Texas Penal Code while "in the course of committing or attempting to commit . . . obstruction or retaliation." TEX. PENAL CODE ANN. § 19.03(a)(2); *see* TEX. PENAL CODE ANN. § 19.02(b)(1) (Supp.).

As a result, we decline to do so. We, therefore, conclude that Harris had the ability to identify the Penal Code provision that he was alleged to have committed and had enough information to determine that the trial court had jurisdiction over his case, both of which are critical factors in our analysis. *See Kirkpatrick*, 279 S.W.3d at 328. As a result, we overrule Harris's second point of error.

## IV. The Trial Court Did Not Err When it Admitted the Complained-of Extraneous Offense

In his third point of error, Harris argues that the trial court erred when it admitted evidence (1) of anything that occurred after he shot Tia in the office and (2) of the January 6, 2019, incident.

### A. Standard of Review and Applicable Law

"We review a trial court's decision to admit or exclude evidence for an abuse of discretion." *Flowers v. State*, 438 S.W.3d 96, 103 (Tex. App.—Texarkana 2014, pet. ref'd) (citing *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010)). "Abuse of discretion occurs only if the decision is 'so clearly wrong as to lie outside the zone within which reasonable people might disagree.'" *Id.* (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008) (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g))). We are not to substitute our own decisions for those of the trial court. *Id.* (citing *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003)). We should uphold a trial court's evidentiary ruling if we find it "correct on any theory of law applicable to the case." *Id.* (citing *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009)).

28

Under Rule 404(b), "evidence of other crimes, wrongs, or acts is not admissible 'to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.'" *Davison v. State*, 602 S.W.3d 625, 651 (Tex. App.—Texarkana 2020, pet. ref'd) (quoting TEX. R. EVID. 404(b)(1)). "But it may 'be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, . . . absence of mistake, or lack of accident.'" *Id.* (quoting TEX. R. EVID. 404(b)(2)). "The exceptions listed under Rule 404(b) are neither mutually exclusive nor collectively exhaustive." *Id.* (quoting *De La Paz*, 279 S.W.3d at 343).

"Rule 404(b) is a rule of inclusion rather than exclusion." *Id.* (quoting *De La Paz*, 279 S.W.3d at 343). "The rule excludes only that evidence that is offered (or will be used) solely for the purpose of proving bad character and hence conduct in conformity with that bad character." *Id.* (quoting *De La Paz*, 279 S.W.3d at 343). "Whether extraneous offense evidence has relevance apart from character conformity . . . is a question for the trial court." *Id.* (quoting *De La Paz*, 279 S.W.3d at 343).

Harris maintains that the January 6, 2019, incident had "nothing to do with the evidence of what occurred on January 30, 2020, other than to incite and inflame the passions of the jury against [him]." He continues, "No need to give all the details of a weapon being fired or details of combat between the parties. All that served was to give the jury improper and irrelevant evidence of an unrelated offense."

The State contends that the complained-of evidence was admissible as contextual evidence. In addition to the explicit exceptions set out in Rule 404(b), extraneous-offense

evidence may be admissible as contextual evidence. There are two types of contextual evidence: (1) same transactional evidence, which refers to other offenses connected with the primary offense, and (2) background contextual evidence,[19] which includes all general background evidence. *Mayes v. State*, 816 S.W.2d 79, 86 (Tex. Crim. App. 1991). Same-transaction evidence is admissible as an exception to Rule 404(b) when the evidence is essential for the State to rationally present evidence of the charged offense. *Id.* at 86 n.4. "Only if the facts and circumstances of the instant offense would make little or no sense without also bringing in the same transaction contextual evidence, should the same transactional evidence be admitted." *Rogers v. State*, 853 S.W.2d 29, 33 (Tex. Crim. App. 1993).

Here, Harris was charged with capital murder, with the enhancing offense of retaliation. The State alleged, and the evidence shows, that just one day before Harris showed up at the Meadows apartments, he asked Daniels to write a character letter to the judge who was presiding over Harris's criminal case on the charge arising from the January 6 incident. In no uncertain terms, Daniels refused to comply with Harris's request, thereby irritating Harris.

The very next day, an extremely irritated Harris went to the Meadows with a gun, ready to shoot and kill Daniels. After he shot and killed Tia in lieu of Daniels, Harris proceeded to go on what can only be described as a rampage through the apartments. Within minutes of arriving at the apartment complex, Harris turned the gun on O'Neal's apartment and what he believed to be Robinson's apartment. Both individuals were prospective witnesses in his January 6 court

---

[19]Background contextual evidence, which is not relevant to our discussion, "fill[s] in the background of the narrative and give[s] it interest, color, and lifelikeness." *Mayes*, 816 S.W.2d at 87. Background contextual evidence is not admissible for "one of the 'other purposes' under which . . . evidence may be admitted under Rule 404(b)" if it includes an impermissible character component. *Id.* at 85.

proceedings, with O'Neal being Harris's victim and Robinson being the individual who intervened on her behalf. Moreover, during his interview on the capital murder charge, Harris talked more about the January 6 incident than the offense for which he was arrested.

Here, "the facts and circumstances" of the capital murder offense would have made "little or no sense" to the jurors without them having knowledge of the "the facts and circumstances" of the January 6 incident. *See id.* In fact, the two offenses are so interwoven that the State would have been unable to charge Harris with capital murder without also charging him with retaliation, which charge was based exclusively on the January 6 incident.

We overrule Haris's third point of error.

## V. Conclusion

We affirm the judgment of the trial court.


Scott E. Stevens
Chief Justice

Date Submitted:      February 6, 2025
Date Decided:        June 25, 2025

Do Not Publish

31